The STATE of Ohio, Appellee,

v.

SUTORIUS, Appellant

[Cite as *State v. Sutorius* (1997), 122 Ohio App.3d 1.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–960547.

Decided June 25, 1997.

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Ronald W. Springman, Jr.*, Assistant Prosecuting Attorney, for appellee.

*R. Scott Croswell III* and *Elizabeth E. Agar*, for appellant.

GORMAN, Judge.

Defendant-appellant Della Dante Sutorius was convicted of the aggravated murder of her husband of eleven months, Dr. Darryl Sutorius ("Dr. Sutorius"). Raising four assignments of error, Sutorius contends that the admission of irrelevant and scandalous hearsay testimony, the failure of the state to turn over exculpatory material from its investigation, and prosecutorial misconduct ultimately deprived her of a fair trial. As any errors in the admission of hearsay testimony or in the disclosure of exculpatory material were harmless in light of the substantial evidence of guilt, and as the prosecution did not commit misconduct, the verdict of the jury and the judgment and sentence are affirmed.

Dr. Sutorius, a cardiac surgeon, married Sutorius on March 2, 1995. Sutorius had four or five previous marriages. The two met through a dating service several months after Dr. Sutorius's first marriage of thirty years ended in divorce.

Their brief marriage was a turbulent one. Fights over money, who would control the income from Dr. Sutorius's surgical practice, and whether any money would be spent to support the children of his first marriage overwhelmed any affection between the two.

Dr. Sutorius ultimately consulted with an attorney. He frequently expressed his fear of his new wife to his attorney. Upon his attorney's advice, while she was away, he broke down the locked door of Sutorius's separate bedroom, removed a semiautomatic handgun and turned it over to the police. While giving the handgun to Corporal James Angel, of the Hamilton County Sheriff's Office, Dr. Sutorius again expressed his fear of his wife. .

His attorney explained to Dr. Sutorius that in the event of divorce, Sutorius would have little claim on his wealth. If, however, he died during the marriage, she would receive the proceeds of his retirement plan, his principal liquid asset, by operation of federal law. The attorney prepared the legal documents necessary for divorce, including a temporary restraining order against Sutorius requiring her to keep away from the doctor. Dr. Sutorius planned to file for divorce on Monday, February 19, 1996.

In early January 1996, as the stress of his ill-made marriage grew, Dr. Sutorius sought treatment from Dr. Louis Spitz, a psychiatrist. Over a number of counseling sessions, Dr. Sutorius relayed his fear of Sutorius. He told how Sutorius threatened him, how she listened in on his calls, how she was very interested in his financial matters, how she swore he would not spend any money on his daughter's upcoming wedding, and how she threatened to embarrass him publicly. Dr. Spitz treated him for depression but noted an improvement as he looked forward to the wedding. Dr. Spitz also referred Dr. Sutorius and his wife to a marriage counselor, Miriam Warshauer. Though both Dr. Sutorius and his wife met with Warshauer, Dr. Sutorius frequently spoke with her alone. He told her of his fear of Sutorius, and of the dreadful conditions he experienced in the marriage.

Sutorius told her half-sister that she too was unhappy in the marriage. She noted that if Dr. Sutorius was not around, she would be worth $1 million.

On February 9, 1996, Sutorius went to a local gun store and purchased a used revolver. She applied for the gun using a driver's license she had renewed that day. She asked the sales clerk not to call her at home when the federally mandated waiting period was over because she did not want her husband to know she had bought the gun. On February 17, 1996, she returned to pick up the weapon. She fired twenty-five rounds from the revolver at the store's target range. She took home the paper target displaying her accuracy. Later that day, she purchased ammunition from a local discount store. Early the next morning,

the Sutoriuses' next-door neighbors were awakened by a loud bang. Their clock radio read 2:30 a.m.

On February 18, 1996, Dr. Sutorius did not conduct a scheduled visit to one of his hospitalized patients. Nor did he answer pages from a hospital nurse. On Monday, February 19, Dr. Sutorius did not arrive for work. His office manager reported the matter to the Hamilton County Sheriff's Office.

Deputies arrived at Dr. Sutorius's house. Sutorius answered the door and in response to the deputies' inquiry, she said that her husband was not home, but she verified that his car was in the garage. Sutorius admitted the deputies to the home. While they were examining the car, Sutorius left the garage. The deputies heard Sutorius scream. Joining her in the basement they discovered Dr. Sutorius's body on the couch. His head was lying in a large pool of blood. He had been dead some time.

A handgun rested near the body. While no fingerprints were found on the gun, the handle, normally covered by the palm of the person shooting the weapon, was smeared with blood. There were no signs of recent forced entry, and no items were missing from the house. Dr. Sutorius's watch and wallet were on the table near his body. The alarm system was functioning.

The Hamilton County Coroner, a forensic pathologist, conducted an autopsy. The coroner concluded that Dr. Sutorius had died from a single gunshot wound to the right side of his head, near the top of his right ear. A second bullet was found lodged in the carpet. The fatal shot came from a .38–special bullet fired at a distance of three-quarters of an inch to one-and-one-half inches from the doctor's head, with an angle of travel from back to front and from right to left through the brain. Although the shot rendered Dr. Sutorius immediately unconscious, the presence of exhaled blood on his hands, his upper arm, the sofa, and the coffee table indicated to the coroner that Dr. Sutorius drew a few breaths before expiring. The coroner concluded that Dr. Sutorius was killed by another person while he was asleep on the couch. The noncontact nature of the wound, the angle that the bullet entered the skull, and the presence of blood on Dr. Sutorius's hands and arms, the couch and the gun were inconsistent with suicide. The coroner said he had never investigated a suicide accomplished in this manner.

A blood-spatter expert also concluded that blood patterns found at the crime scene, including the presence of blood on the handgun, indicated that Dr. Sutorius was murdered and did not commit suicide. He believed that the hand and legs of Dr. Sutorius had been repositioned to make it seem as if he had taken his own life.

During the investigation, Sutorius made a number of statements to friends and police. As her husband's body was removed from the house, she asked, "Are you mad at me Darryl? Are you mad at me?" She was questioned by police for six and one-half hours. When she was eventually taken into custody, she asked a police officer if someone going to jail for life would serve the sentence at the Hamilton County Justice Center. While awaiting trial there, she was visited by Robin Zygmont. Zygmont later stated that Sutorius admitted to her that she had fired the revolver two times because "there was no way out," that she was going to say her husband committed suicide, and that she needed Zygmont to be an alibi witness.

During a search of the residence, a box containing a small baggie of cocaine was found next to Sutorius's bed. Sutorius was ultimately indicted by the Hamilton County Grand Jury for aggravated murder, with a firearm specification, and for drug abuse.

A trial began in the Hamilton County Court of Common Pleas on May 20, 1996. Over forty witnesses testified for the state, including many who related statements made by Dr. Sutorius expressing his fear of his wife. The defense presented two expert witnesses who testified that Dr. Sutorius was at risk for suicide, and that involuntary muscular movements or seizures could result from a serious head injury such as that sustained by Dr. Sutorius. Sutorius did not testify. The state moved ninety-two exhibits into evidence, including the murder weapon, a .38–special revolver purchased by Sutorius two days before the death of Dr. Sutorius.

Sutorius's theory of the case was that her husband was despondent, perhaps over the end of their marriage, and had committed suicide. This theory was contradicted by the physical evidence and testimony, including that from Dr. Spitz that Dr. Sutorius was not suicidal in February 1996, and from his sister that he was upbeat in anticipation that his marriage would soon be over.

On June 7, 1996, the jury returned verdicts of guilty. On June 24, 1996, the trial court entered a judgment of conviction for aggravated murder, in violation of R.C. 2903.01(A), with a specification that the crime was committed with a firearm, and for drug abuse, in violation of R.C. 2925.11(A).

Sutorius filed a motion for a new trial with attached exhibits, including an affidavit and a videotaped, Court TV interview with the lead assistant prosecutor. The trial court overruled the motion on June 26, 1996. Her timely appeal followed.

## ADMISSION OF HEARSAY EVIDENCE

In her first assignment of error, Sutorius argues that the trial court erred by denying that part of her motion for a new trial made pursuant to Crim.R.

33(A)(5), as cumulative errors in the admission of hearsay testimony violated the Rules of Evidence and her due process rights.

Crim.R. 33(E) provides:

"No motion for a new trial shall be granted or verdict set aside, nor shall any judgment of conviction be reversed in any court because of:

"* * *

"(3) The admission or rejection of any evidence offered against or for the defendant, unless the defendant was or may have been prejudiced thereby."

▮ Review of the trial court's decision to admit hearsay is not governed by an abuse-of-discretion standard. Rather, the trial court's admission of hearsay is to be reviewed in light of Evid.R. 103(A) and the standard established in Crim.R. 52(A), which provides that any errors are harmless unless the record demonstrates that they affected a party's substantial right. *State v. Sorrels* (1991), 71 Ohio App.3d 162, 165, 593 N.E.2d 313, 314–315; Evid.R. 103(A); *State v. Kidder* (1987), 32 Ohio St.3d 279, 284, 513 N.E.2d 311, 317; *State v. Bayless* (1976), 48 Ohio St.2d 73, 2 O.O.3d 249, 357 N.E.2d 1035, paragraph seven of the syllabus; cf. *State v. Sumlin* (1994), 69 Ohio St.3d 105, 108, 630 N.E.2d 681, 684 (because the trial court must determine whether corroborating circumstances betoken trustworthiness, the decision whether to admit the hearsay statement of an unavailable declarant, pursuant to Evid.R. 804(B)(3), is within the discretion of the trial court). Therefore, the trial court's denial of the motion for a new trial is not reversible error unless the court's decisions to admit hearsay testimony were erroneous as a matter of law and prejudiced Sutorius by affecting her substantial rights.

▮ Sutorius first argues that the trial court improperly admitted the hearsay testimony of Deborah Sutorius, the victim's daughter, Carlene Schultz, the victim's sister, Corporal James Angel, and Richard Brunsman, a friend of the victim, and certain hearsay testimony of Miriam Warshauer, a marriage counselor, and Dr. Louis Spitz, the victim's psychiatrist, as Evid.R. 803(3) statements of Dr. Sutorius's then-existing state of mind, emotion, sensation, or physical condition. Over strenuous objection by defense counsel, each witness testified to Dr. Sutorius's fear of his wife or his fear that she would kill him.

Evid.R. 803(3) states:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

"* * *

"(3) Then existing, mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical

8

condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

Out-of-court statements about a declarant's then-existing mental condition are considered trustworthy because their spontaneity makes them more reliable than hearsay in general. Weissenberger, Ohio Evidence (1996) 365, Section 803.30. In *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 514 N.E.2d 394, the court permitted hearsay evidence reflecting a victim's fearful state of mind and fear of the defendant. The court limited this testimony to a reflection of the state of mind of the victim. It did not permit testimony on the reasons underlying that state of mind. *Id.* at 21–22, 514 N.E.2d at 398; see, also, *State v. Awkal* (1996), 76 Ohio St.3d 324, 331, 667 N.E.2d 960, 967; *State v. Frazier* (1995), 73 Ohio St.3d 323, 652 N.E.2d 1000. The Supreme Court also held that the testimony must point forward in time rather than to events of the past. *State v. Apanovitch*, 33 Ohio St.3d at 21–22, 514 N.E.2d at 398.

Here, the trial court required the state to proffer the proposed testimony of its witnesses at sidebar conference, out of hearing of the jury. By carefully circumscribing the questions asked of those witnesses, the trial judge properly exercised the required caution to ensure that the witnesses testified only to Dr. Sutorius's fear of his wife and not to the facts which formed the basis of that fear. See *State v. Frazier*, 73 Ohio St.3d at 338, 652 N.E.2d at 1013.

■ The challenged statements fall within the Evid.R. 803(3) exception. The victim made the statements at a time that reflected his then-existing state of mind: that he was fearful of Sutorius. *State v. Apanovitch.* The trial court did not err in admitting this testimony.[1]

■ Sutorius next argues that even if the foregoing statements were admissible as exceptions to the hearsay rule of Evid.R. 802, they described events too remote in time from Dr. Sutorius's death and too inflammatory and prejudicial to have been heard by the jury. See Evid.R. 402 and 403. Relevance and admissibility of evidence are matters within the trial court's discretion. Evid.R. 104. The trial court did not abuse its discretion by making an unreasonable, arbitrary or unconscionable decision in allowing witnesses to testify about Dr. Sutorius's fear of his wife. See *State v. Frazier*, 73 Ohio St.3d at 338, 652 N.E.2d

---

1. The state's argument that this issue has been waived must fail. The cross-examination of a witness with respect to testimony that has otherwise given rise to an objection does not waive the complaining party's objection for purposes of appeal. *State v. Johnson* (Mar. 26, 1997), Hamilton App. No. C–960583, unreported, 1997 WL 133435.

at 1013. Accordingly, the statements were not inadmissible hearsay, and the trial court did not abuse its discretion in admitting them.

■ The admissibility of so-called "dying declarations," hearsay admissible as an exception pursuant to Evid.R. 804(B)(2), was a matter of significant debate during this trial. Sutorius filed no less than three motions *in limine* and a responsive memorandum seeking the exclusion of hearsay statements not made in contemplation of death, including statements made by Dr. Sutorius and recorded on his daughter's telephone-answering machine. The trial court conducted an extensive pretrial hearing on this issue. In closing argument, the state argued that Dr. Sutorius's statements were "truly a voice from the grave. I may not live through this. A dying declaration."

Despite the obligation imposed by App.R. 12(A)(2), Sutorius has not identified where in the record the trial court admitted hearsay statements *into evidence* under the "dying declaration" exception. The state, however, inexplicably contends that statements made by Dr. Sutorius on the telephone-answering machine were properly admitted as dying declarations under Evid.R. 804(B)(2).

The tape recording was played to the jury while the state conducted its direct examination of Deborah Sutorius. At a lengthy sidebar conference, the trial court redacted portions of the tape. Over the strenuous objection of defense counsel, the trial court admitted the tape into evidence pursuant to Evid.R. 803(3), as it reflected Dr. Sutorius's then-existing mental state, not as a dying declaration. The trial court did not err. *State v. Apanovitch.*

As the admission into evidence of hearsay statements pursuant to a firmly rooted hearsay exception, such as Evid.R. 803(3), does not violate Sutorius's constitutional right to confrontation of witnesses against her, her due process claim must fail as well. *White v. Illinois* (1992), 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848; *State v. Dever* (1992), 64 Ohio St.3d 401, 596 N.E.2d 436, paragraph three of the syllabus.

■ Sutorius next argues that the trial court erred by improperly admitting into evidence Dr. Sutorius's out-of-court statements about his fear of her, including the basis of that fear, to Dr. Spitz, and to Miriam Warshauer, pursuant to Evid.R. 803(4), as statements made for purposes of medical diagnosis or treatment.

Evid.R. 803 states:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

"* * *

"(4) Statements for purposes of medical diagnosis or treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

Although hearsay, this type of statement is deemed more reliable than hearsay in general if *the declarant* makes the statement in *subjective contemplation* that it will be relayed to a physician for the purpose of diagnosis or treatment. *State v. Dever*, 64 Ohio St.3d at 407, 596 N.E.2d at 441–442; Weissenberger, Ohio Evidence (1996) 380, Section 803.47.

Here, the trial court erred when, in remarks directed to Warshauer, it held that "[l]egally that portion [of Dr. Sutorius's statements] *you believed* [were] being presented to you for the purposes of diagnosing and treating Dr. Sutorius" were admissible pursuant to Evid.R. 803(4). It is Dr. Sutorius's subjective contemplation of the purpose of his statements, not Warshauer's beliefs, that would have ensured the trustworthiness of these statements. Neither did the trial court ascertain whether statements made to a marriage counselor, for purposes of analysis and resolution of marital woes, contain the same guarantee of trustworthiness as those made to a medical doctor for purposes of medical or even psychiatric treatment. *State v. Dever.*

Following the court's erroneous ruling, Warshauer proceeded to bring a number of Dr. Sutorius's out-of-court statements into evidence. Relying on Dr. Sutorius's statements, mostly from telephone conversations, Warshauer informed the jury that the doctor was afraid of Sutorius because she had raged out of control in a fight, threatened to report him to the IRS and to disclose embarrassing personal matters to his colleagues, threatened to kill him, kept a gun under her mattress, bolted the door to her room at night, and would kill him if he did not do what she wanted, because on January 25, 1996, Sutorius's mother had called to warn him of Sutorius's dangerousness and to inform him that Sutorius had burned down a former boyfriend's house; and because Dr. Sutorius said, "I'm scared Dante will kill me in my sleep."

The trial court erred in admitting Warshauer's testimony about those statements not clearly reflecting Dr. Sutorius's then-existing mental state of fear.

Additionally, Dr. Spitz tried to bolster the reliability of these statements by reiterating his own opinion of them, and Miriam Warshauer's opinion of Sutorius's dangerousness. As Sutorius correctly argues, Dr. Spitz's relaying of Warshauer's opinion that Sutorius was dangerous was hearsay within hearsay, and was inadmissible under Evid.R. 805.

The gravamen of Sutorius's cogent legal arguments is that by permitting Warshauer and Spitz to testify to hearsay statements of Dr. Sutorius that Sutorius was dangerous and that she was going to kill him, the court short-circuited the jury's role in determining the ultimate fact at issue in this trial, *i.e.*, whether Sutorius killed her husband.

Much, but not all, of Warshauer's and Spitz's testimony was duplicative of testimony of other witnesses. Where there was ample testimonial evidence and physical evidence, properly admitted, from which the jury could permissibly and reasonably infer that the ultimate fact was true, we cannot say that the erroneous admission of hearsay testimony, although it did not relate to Dr. Sutorius's then-existing state of mind, or did not properly relate to medical treatment or diagnosis, prejudiced Sutorius to the extent that she was denied a fair trial. Crim.R. 33(E). It was the jury's reasonable inference of the ultimate fact, that Sutorius killed her husband, rather than the acceptance of incompetent evidence that led to Sutorius's undoing. See *Shepard v. United States* (1933), 290 U.S. 96, 98, 54 S.Ct. 22, 23, 78 L.Ed. 196, 198 (Cardozo, J.).

Therefore, any error in allowing Warshauer's or Spitz's testimony pursuant to the medical exception was harmless on this record and does not justify reversal and a new trial. Crim.R. 33(E)(3); *State v. Lundgren* (1995), 73 Ohio St.3d 474, 485, 653 N.E.2d 304, 318; *State v. Carter* (1995), 72 Ohio St.3d 545, 550, 651 N.E.2d 965, 972. The first assignment of error is overruled.

## DISCOVERY VIOLATIONS

In her second assignment of error, Sutorius claims that the trial court erred in not reviewing the state's file of statements or notes taken during witness interviews to determine whether all exculpatory material had been given to defense counsel as provided by the Ohio discovery rules and due process.

Prior to trial, appellant filed numerous motions seeking to ensure that the state had complied with the discovery requirements of *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–1197, 10 L.Ed.2d at 218.

Sutorius made repeated specific requests of the state for disclosure of material mentioning suicide, suicide attempts or depression relating to Dr. Sutorius's motive for suicide. The state disclosed that the only evidence responsive to her request was the statement of Dr. Spitz, the victim's psychiatrist. On May 7, 1996, defense counsel received information that witness Elizabeth Brutvan, a

neighbor and acquaintance of Sutorius, had also made statements to the prosecution concerning suicide attempts by the victim and his general despondency over his marriage to Sutorius. At a May 9, 1996 hearing on the matter, Sutorius asked the trial court to conduct an *in camera* inspection of the state's file to ensure disclosure of any remaining *Brady* material. At the conclusion of the hearing, the trial court refused to conduct an *in camera* inspection, but did state:

"I am going to ask that all the statements made by the witnesses that are in the hands of the prosecution be delivered to the court reporter and placed in a sealed state, for review by the Court of Appeals * * *."

A specific discovery request may require the trial court to review the contested matter *in camera*. See *Pennsylvania v. Ritchie* (1987), 480 U.S. 39, 58, 107 S.Ct. 989, 1001–1002, 94 L.Ed.2d 40, 58. In *State v. Lawson* (1992), 64 Ohio St.3d 336, 595 N.E.2d 902, however, the Ohio Supreme Court held:

"[R]egardless of whether the request in this case is classified as a general request for exculpatory material or one for disclosure of specific material, we conclude the trial court's failure to conduct an *in camera* inspection was not reversible error. Although the trial court did not review the prosecutor's notes, they are in the record for appellate review. Since the trial court is in no better a position than a reviewing court to recognize *Brady* material, a reviewing court's examination is a fair substitute for *in camera* inspection at trial." *Id.* at 344, 595 N.E.2d at 909.

This court has conducted the review envisioned in *State v. Lawson* and has found no additional exculpatory material relating to Sutorius's defense, *i.e.*, that Dr. Sutorius took his own life.

Since the trial court ordered the state to seal its files and included them in the record for consideration by this court, the trial court's error, as claimed by Sutorius, in failing to conduct an *in camera* inspection of the relevant statements after a specific request had been made by the defense was harmless at best. Accordingly, any supposed error in the trial court's failure to examine was harmless. *State v. Lawson.* The second assignment of error is overruled.

## PROSECUTORIAL MISCONDUCT

In her third assignment of error, Sutorius first claims that the trial court erred in denying her motions for mistrial made during the trial and in denying her motion for a new trial made prior to sentencing. Based upon the resolution of the first and second assignments of error, we conclude that the trial court did not erroneously deny Sutorius's motion for a new trial on the grounds of evidentiary errors and discovery violations. Crim.R. 33.

■   Sutorius's principal contention in this assignment of error is that the assistant prosecuting attorney, in the rebuttal portion of closing argument, commented on her decision not to testify in violation of her privilege against self-incrimination guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution. See *Griffin v. California* (1964), 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106, 110.

■   The test for prosecutorial misconduct in referring to a defendant's failure to testify is "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *State v. Cooper* (1977), 52 Ohio St.2d 163, 173, 6 O.O.3d 377, 382, 370 N.E.2d 725, 733, vacated in part on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1157; *State v. Webb* (1994), 70 Ohio St.3d 325, 328–329, 638 N.E.2d 1023, 1028.

Before closing argument, the state sought and received instructions from the trial court preventing defense counsel from commenting on the substance of Sutorius's statements made to police on February 19, 1996, at the Hamilton County Sheriff's patrol headquarters, District 1.[2] The trial court declared:

"Now the evidence is in. To comment on matters that are not in evidence is inappropriate and to refer to statements your client made to you would be inappropriate and I'll strike them because they are not in evidence. She chose not to testify. She has every right in the world not to do that, but you can't use it to your advantage and you know that."

In his closing argument, counsel for Sutorius elected to challenge the credibility of the state's theory of the case:

"Then they say, will you go to the police station and talk to us about this? And she says, yes, you know.

"What's significant, she didn't say, I need a lawyer, I need a mouth here now. I have got to get one of those high-priced guys to come protect me. She said, no, I'll go.

"What you know is she then went and submitted herself to questioning about this event for six-and-a-half hours. Six-and-a-half hours, to the police officers, without once asking for a lawyer, until they looked up and said, well, we also found cocaine, and she said, get me a lawyer.

"In other words, I'll sit and talk to you for six-and-a-half hours about the death of my husband, my involvement in it, what I know about it, but Christ, man, if you find four milligrams of cocaine, get me a lawyer.

---

2. These statements were the subject of a defense motion seeking their suppression.

"What's that tell you? Let me ask another question. You want to talk about good faith. You want to know what Della's got to say? I will tell you a little about what Della's got to say. I will tell you.

"Don't you believe it would be real significant to hear what their two police officers who grilled her for six-and-a-half hours had to tell you what was said?

"There is only one conclusion you can draw, ladies and gentlemen, why you didn't hear from them. You didn't hear from them, you didn't hear from them because she maintained her innocence.

"You didn't hear from them because she didn't tell them one thing that they could prove a lie. If she said one thing to them in six-and-a-half hours that they could have proven a lie they would have put the State on, they would have proven it a lie and they would have said she's a liar.

"Try that one on when you are trying to figure out good faith and who wants the truth out in this courtroom."

In rebuttal closing argument, the assistant prosecuting attorney commented on defense counsel's remarks:

"Mr. Croswell makes a big deal of Della's statement to the police six-and-a-half hours, and you don't know what's in that statement.

"Well, Mr. Croswell says a couple things to you. They might be a lot of things, but he is not stupid. I will give you that. He's not. He is an attorney that knows what he is doing.

"If Mr. Croswell wanted to get that statement before you, he knew how to do it. He didn't, either. So that's a push. Let's just go with that."

Immediately thereafter, defense counsel objected and moved for a mistrial stating:

"That clearly is erroneous. Now, that's what they thought about for the entire week, that that statement not go in. They came up here and they made you order me not to put it in and to say I could put it in is outrageous."

The trial court sustained the objection to the prosecutor's statement and overruled the motion for a mistrial.

Based upon a review of the entire record, including the exhibits attached to her motion for a new trial, Sutorius was not deprived of a fair trial by the prosecutor's comments in closing argument. The jury in this case would not have "naturally and necessarily" taken the prosecutor's comments as denigrating Sutorius's position based on her failure to testify.

The prosecutor's comment on the trial tactics of defense counsel is innocuous when viewed in the context of closing argument. The prosecutor's comments

focused the jury on defense counsel's tactic and away from the six-and-a-half-hour statement that was not in evidence. The comment was not manifestly intended to be a comment on her failure to testify, but rather was made to rebut a perception created by defense counsel that the state was hiding probative evidence of Sutorius's innocence from the jury. The jurors remained free to weigh the evidence properly presented at trial.

Therefore, the prosecutor's argument was within the acceptable scope allowed for closing argument, was made in response to defense counsel's tactics, and did not prejudicially affect Sutorius's substantial rights to a fair trial, because it was not "manifestly intended" to refer to Sutorius's failure to testify at trial. *State v. Webb,* 70 Ohio St.3d at 328–329, 638 N.E.2d at 1028; *State v. Lott* (1990), 51 Ohio St.3d 160, 555 N.E.2d 293. The trial court did not err in denying Sutorius's motion for a new trial on this basis.

Because the trial court did not act arbitrarily, unreasonably or unconscionably in denying Sutorius's motion for a mistrial, this court will not reverse its decision. *State v. Chitwood* (1992), 83 Ohio App.3d 443, 448, 615 N.E.2d 257, 260; *State v. Widner* (1981), 68 Ohio St.2d 188, 22 O.O.3d 430, 429 N.E.2d 1065; *Goudy v. Dayton Newspapers, Inc.* (1967), 14 Ohio App.2d 207, 43 O.O.2d 444, 237 N.E.2d 909. Sutorius's third assignment of error is overruled.

## WEIGHT AND SUFFICIENCY OF THE EVIDENCE

In her last assignment of error, Sutorius claims that the trial court erred in denying her motion for judgment of acquittal and in entering judgment against her, and in denying that portion of her motion for a new trial based upon the weight of the evidence. The essence of her argument challenges the sufficiency and the weight of the evidence adduced to support her conviction, for aggravated murder, in violation of R.C. 2903.01(A), with a specification that the crime was committed with a firearm, and for drug abuse, in violation of R.C. 2925.11(A).

Our review of the record fails to persuade us that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Tibbs v. Florida* (1982), 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652; *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 546–547. The jury was entitled to reject Sutorius's defense that Dr. Sutorius took his own life.

The record also contains substantial, credible evidence from which the jury could have reasonably concluded that all elements of the charged crimes were proven beyond a reasonable doubt. *State v. Waddy* (1991), 63 Ohio St.3d 424, 588 N.E.2d 819.

16

Moreover, the trial court did not err in denying the motions for a judgment of acquittal, as reasonable minds could have reached different conclusions as to whether each element of the crimes charged had been proven beyond a reasonable doubt. Crim.R. 29; *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184.

Further, the trial court did not abuse its discretion in denying Sutorius's motion for a new trial made pursuant to Crim.R. 33(A)(4). The fourth assignment of error is overruled.

Therefore, the judgment of the trial court is affirmed.

*Judgment affirmed.*

DOAN, P.J., and SUNDERMANN, J., concur.