DECISION.
The defendant-appellant, Richard Jones, Jr., brings these appeals from his conviction, after a trial by jury, on a single count of voluntary manslaughter and two counts of felonious assault. He was sentenced to serve a term of ten to twenty-five years for the voluntary manslaughter, to run consecutively to concurrent terms of six to fifteen years for the two counts of felonious assault. Through counsel appointed to represent him on appeal, Jones has given us eight assignments of error.
The factual origins of the cases began in October 1990. At that time, Jones and Mona Mills were involved in a relationship that had produced two children. Mills was pregnant with her third child by Jones, when, on the evening of October 12, 1990, Jones came to Mills's apartment and inquired about where she had been earlier. Mills answered that she had been "out drinking." Jones, angered by Mills's response, went to the kitchen, boiled a pan of water, and poured it on Mills's arm. Then he bludgeoned her in the head with a forty-ounce bottle of beer and fled. The police were summoned and took Mills to a hospital, where her burns were treated and the lacerations to her scalp were closed with surgical clamps. These events provided the basis for Jones's indictment on the two counts of felonious assault.[1]
Mills and Jones had no further contact until the early evening hours of October 20, 1990. In the interim, Mills had persuaded her friend, Rochelle Hardy, to move into her apartment, ostensibly because she feared that Jones would return to retaliate for the criminal charges stemming from the assaults.
On the evening of October 20, at about 7:00 p.m., Mills was in her apartment in the company of Lloyd Martin, drinking beer and watching the World Series on television, when Jones entered. Jones gave Martin money and sent him from the apartment to purchase more beer. Shortly after Martin had gone, Hardy arrived at the apartment. An argument then ensued between Jones and Mills, during which Jones seized Mills's scalded arm, causing her to scream in pain. Jones and Hardy then began to argue at close range, with each shouting into the face of the other and with Jones, at some point in the course of the argument, displaying a pocketknife. Hardy told Jones to leave, and as he did so, Hardy exclaimed that she was going to call for police assistance because Jones had stabbed her. Mills testified at trial that, as Jones left the apartment, she had seen blood dripping from Hardy's body, but she denied that she had seen Jones stab Hardy.
At that point, Martin reappeared at the doorway, only to have Hardy collapse into his arms. Martin testified at trial that Hardy had stated to him as she died that Jones had stabbed her. When the police arrived, they saw Martin in a shaken condition, cradling Hardy's lifeless body in his arms. Martin repeated to them Hardy's accusation that Jones had stabbed her.
The postmortem examination of Hardy revealed a wound near the center of her back, consistent with one inflicted by a knife, that had penetrated to the right lower lung and a major blood vessel, resulting in death by exsanguination.
A state's witness, Calvin Reddick, with whom Jones had lived intermittently, testified that, late at night on October 20, 1990, Jones had appeared outside a window of his home asking for a change of clothing. Jones's shirt had appeared to Reddick to be blood-stained and his lip looked swollen.
When Jones was interviewed by police in 1998, he stated that Hardy had hit him in the mouth with a hammer. The prosecution stipulated that a fragment of a tooth found at the scene of the homicide was Jones's.
Warrants had been previously issued for the October 12 assaults, and one for the offense of murder was issued immediately after the events of October 20. After their investigation had convinced them that Jones had killed Hardy, the police attempted to locate Jones by broadcasting his description and circulating printed material bearing his photograph. Ultimately, the warrants were sent to the National Crime Information Center, a facility that advises law enforcement agencies that an individual is wanted. A warrant for unlawful flight and avoiding prosecution was issued as well. Members of Jones's family in Kentucky were contacted by the police, and arrangements were made for Jones to surrender to the authorities on either October 21 or 22 at the automobile repair station at which Jones had worked. Jones failed to appear. On December 19, 1990, he was indicted for Hardy's murder
In March 1998, police in Riverside, California, had Jones in custody on unrelated charges and became aware of the charges against Jones in Ohio. Cincinnati police officers interviewed Jones in California and upon his return to Cincinnati.
After being given Miranda warnings, Jones denied stabbing Hardy. He instead claimed that a man, heavier than he, driving a black Buick automobile and in the company of another man, had killed Hardy. He said that he had gone to Mills's apartment to give her money for the children, and that, when no one answered his knock, he had opened the door, had proceeded into the dark apartment, and had been rendered unconscious. When he recovered his senses, he was lying prone on the threshold of the apartment, and the door was closed. He denied any contact that evening with Mills, Hardy or Martin.
Jones stated that he had thereafter returned to the street to find that the automobile he had driven to the apartment was missing. He proceeded on foot to the house of his friend "Jack," whose last name or address he would not divulge, and then to the home of another friend, who told him that "he was in big trouble for running somebody over in his car," an assertion that Jones said was "bullcrap."
Jones maintained that he had continued to reside and work in the area until 1993. After being shown a photograph of Hardy, he denied that he had known her. The interview ended when, according to the police, Jones invoked his right to an attorney, "got up off the chair and walked out."
On November 24, 1998, Jones was indicted for the assaults on Mills, and the assault and the 1990 murder charges were joined for trial. At his trial, Jones neither testified on his own behalf nor adduced any other evidence. His defense, in part, consisted of attacks on the credibility of the state's witnesses, based upon their consumption of alcohol and drugs and their admitted records of convictions for criminal activity.[2]
The first assignment of error is that the court's failure to sua sponte
dismiss the indictment for the felonious assaults on Mills constituted plain error, because the state's failure to obtain the indictment before the statute of limitations for those offenses had expired denied Jones due process of law. Jones's basic contention is that the delay of some eight years between the date Mills was assaulted and the date Jones was indicted was unjustifiable under the holding in State v. Luck (1984),15 Ohio St.3d 150, 472 N.E.2d 1097.
We note, first, that this issue was never raised below. Theoretically, we could hold that it was thereby waived, obviating the necessity for this court to rule upon it. We prefer to address the question since it involves the fundamental right to due process.
Clearly, the rule in Luck, supra, upon which Jones relies, viz., that an unjustifiable delay between the commission of the offenses and the indictment prejudiced him, requires us to examine the reasons for the hiatus. Because the issue was not broached in the first instance, we must look to the record to determine the factual considerations involved.
The argument submitted by Jones to support his first assignment couples the due-process issue with that of the statute of limitations as it applies to the charges of felonious assault. In this regard, Jones contends, there is no indication that he fled to avoid prosecution on those charges. We disagree.
The evidence adduced by the prosecution was sufficient to prove that Jones had scalded and struck Mills on October 12, 1990, and that Jones had fled immediately after he had inflicted the injuries, not to be seen again by Mills until October 20, 1990. In the interim, criminal complaints based on those actions had been drawn and warrants issued. The pendency of those charges was the reason given by Mills for persuading Hardy to move into the apartment as some sort of protection against further violence by Jones. Although efforts by Cincinnati police to arrest Jones on the warrants were unsuccessful, the evidence showed that members of Jones's family were contacted and that an arrangement was made for Jones to surrender himself. That fact was unrebutted. Jones, however, did not comply, and it was not until March 1998 that police were able to execute the warrants for the assaults and the subsequent murder.
Luck demands, first, that the delay in prosecution be unjustifiable and, then, that it occasion prejudice to the accused. In Luck, the state attributed the delay in prosecution to an "error in judgment" that led to a halt in the active investigation of a homicide that had spanned fifteen years. Justice A. William Sweeney, the author of the opinion in Luck, noted the following:
 During that time, witnesses died, memories faded, and evidence was lost. When the state finally decided to commence its prosecution of the defendant herein, it did so without one shred of new evidence — its case being substantially the same as it had been since 1968. For these reasons, we find that the pre-indictment delay in the instant case is unjustifiable.
 Id. at 159, 472 N.E.2d at 1105. Luck proscribed intentional delay by the prosecution to gain a tactical advantage over a defendant, yet acknowledged the United States Supreme Court's declaration in United States v. Marion (1971), 404 U.S. 307, 92 S.Ct. 455, that the speedy-trial guarantee under the Sixth Amendment to the United States Constitution has no applicability to pre-indictment delays.
We are convinced that Luck is inapplicable to the case before us as the record stands. A reasonable mind could have concluded that the delay in prosecution resulted only from Jones's decision to abscond or otherwise to secrete himself from police. In that light, the delay was justifiable. The ancillary question of whether Jones was prejudiced may well be said to be moot, when the delay has been shown to be justified. In any event, the record dispels any claim that Jones was, in fact, prejudiced.
Jones, in the presence of the court, but outside that of the jury, made a voluntary decision not to testify after the state had rested its case-in-chief. Whatever may have been the full dimension of his defense, Jones elected not to articulate it.
Jones's counsel told him in the presence of the court, before a motion for acquittal was renewed, that the opportunity to plead guilty to "a lesser included offense and to a stated term" still existed. Again, Jones refused to "plead out to anything."
Despite the lack of direct testimony from Jones, his counsel argued to the jury that Jones had acted in self-defense, submitting that Hardy had struck Jones with a hammer forcefully enough to extract a tooth from his jaw. In response to that assault, his counsel contended, Jones had been entitled to "get that person off" of him, stressing the coroner's testimony that there was but one stab wound, and that Hardy's body bore no evidence of defensive wounds. In turn, the court instructed the jury as follows:
 In determining whether or not an affirmative defense [self-defense] has been proved by a preponderance of the evidence, you should consider all the evidence bearing on that affirmative defense regardless of who produced it.
 Given the vacuity of Jones's statements to police about being rendered unconscious outside the apartment by a blow from an undescribed assailant and Jones's knowledge that his fingerprints had been lifted from a beer bottle in Mills's refrigerator and that Hardy had named him as her killer in her dying declaration, that defense was the only one available.
Although Jones was indicted for murder shortly after the homicide was committed, while the indictment for the felonious assaults was not had until late 1998, this idiosyncrasy is inconsequential to Jones's claim of untimeliness in light of our determination that the police had exercised reasonable diligence to execute the arrest warrants. See R.C.2901.13(E).[3]
Jones relies primarily on the thesis that the court committed plain error by failing to dismiss the indictment charging felonious assault. An appellate court will take notice of plain error with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. See State v. Long (1978), 53 Ohio St.2d 91,372 N.E.2d 804, paragraph three of the syllabus. The record here does not provide such grounds.
 For the reasons given, the first assignment of error is overruled. In no way was Jones denied due process of law.
The second assignment of error is as follows:
 Appellant's right[s] to a speedy trial under the United States and Ohio Constitutions, and the Ohio Revised Code were violated as to all offenses in both indictments in that appellant was in the custody of Hamilton County for more than five hundred days immediately preceding the commencement of his trial, and * * * the statutory time was not waived or otherwise excused by law.
 Here, Jones reiterates, in part, his argument that "a delay of eight and one[-]half years between indictment and arrest [was] presumptively prejudicial and require[d] dismissal," specifically because the authorities lacked diligence in apprehending him and pursuing the charges. For the reasons we have given supra, that contention fails.
Additionally, Jones argues that "the time it took to bring [him] to trial following his arrest in 1998, 553 days, requires dismissal." Jones concedes that we are controlled by the rule in State v. McBreen (1978),54 Ohio St.2d 315, 376 N.E.2d 593, that a defendant is bound by any waivers of the time limits set forth in R.C. 2945.17. But he asserts that the "mechanistic application of the rule of McBreen to [his] case constitutes a violation of his right to due process of law."
The transcript of the docket and journal entries details the welter of continuances and their underpinning reasons, beginning on December 15, 1998, on the felonious-assault charges and November 19, 1998, on the murder charge. Continuances also covered the period of March 20, 1999, to April 19, 1999, the day before which Jones's trial commenced. The record persuades us that the state's arithmetic calculation that Jones was brought to trial within seventy-one days, even when the time waived by entries questioned by him is counted against the prosecution, is correct. This satisfies the requirement in R.C. 2945.71(C)(2) that a defendant charged with a felony be brought to trial within 270 days after his arrest or within ninety days after his arrest, when, as here, the defendant is incarcerated. Resultantly, we overrule the second assignment of error.
 Jones has submitted his third, fourth and fifth assignments of error collectively:
 The judgments of conviction are contrary to law and to the due process clause of the Fourteenth Amendment to the Constitution of the United States in that there was insufficient evidence adduced to establish each and every element of each offense beyond a reasonable doubt.
 The judgments of conviction are contrary to the manifest weight of the evidence.
 The trial court erred to the prejudice of appellant by denying his motions for judgment of acquittal pursuant to Crim.R. 29.
 The standards that govern us with respect to the issues raised by the third and fifth assignments are set forth in State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus:
 An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would have convinced the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (Jackson v. Virginia [1979], 443 U.S. 307, 99 S.Ct. 2781 * * *, followed.)
 See, also, State v. Bridgeman (1978), 55 Ohio St.2d 261, 381 N.E.2d 184; State v. Eley (1978), 56 Ohio St.2d 169, 383 N.E.2d 132; State v. Martin (1983), 20 Ohio App.3d 172, 485 N.E.2d 717. Upon the record before us, neither the third nor the fifth assignment has any merit, and upon the authorities cited, they are overruled.
The fourth assignment of error is overruled on the authority of Statev. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus:
 On the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts.
 The record convinces us that the jury neither lost its way nor created a manifest miscarriage of justice. Whatever conflicts in the evidence that may have existed were resolved fairly and accorded with the court's jury charge.
The sixth assignment is as follows:
 The trial court erred in violation of appellant's right of confrontation, in violation of his rights under the Sixth Amendment and O. Const. Art. I, § 10, in permitting the admission of prejudicial hearsay testimony, and also in restricting defense cross[-]examination of state witnesses.
 Jones's argument in support of this proposition centers, first, upon an exchange between Lloyd Martin and Calvin Reddick. Reddick testified that Martin had told him during a chance meeting on the morning after Hardy had died that Jones had killed Hardy, and that he, Reddick, had responded, "You lying [expletive deleted]." Reddick testified that he had thought that Martin was drunk, and that he had not believed that Hardy was dead until detectives investigating the case had confirmed that fact during an interview with him.
Martin, in whose arms Hardy had died, was permitted to testify that Hardy, as she breathed her last breath, had named Jones as the person who had stabbed her. Jones concedes that Hardy's utterance might have been admissible under an exception to the general proscription against hearsay evidence expressed in Evid.R. 801, in that it was a statement made in the face of impending death. See Evid.R. 804(B)(2). Jones also cites the testimony of a police detective who was permitted to state that Martin had told him that Hardy had implicated Jones.
In State v. Sutorius (1997), 122 Ohio App.3d 1, 701 N.E.2d 1, this court held that a review of a trial court's decision to admit hearsay is not governed by an abuse-of-discretion standard; rather, the admission of hearsay is to be reviewed in light of Evid.R. 103(A), which provides that error may be predicated upon an evidentiary ruling only when a substantial right is affected, and Crim.R. 52(A), which provides that an error is harmless unless the record demonstrates that it affected a substantial right.[4]
Jones's defense to the homicide charge was that of self-defense, which necessitated the admission that he, at the very least, had inflicted a stab wound upon Hardy's person while warding off further blows from a hammer. Therefore, statements of others implicating Jones in the stabbing, even if inadmissible hearsay, must be said to have been harmless, because they could not have affected Jones's substantial rights, nor could their exclusion have yielded a contrary result. Accordingly, the sixth assignment of error is overruled.
The seventh assignment is that the court denied Jones his constitutional right to the effective assistance of counsel by entering a judgment of conviction. Jones argues that the two attorneys who, at one time or another, represented him below were ineffective in failing to challenge the delays in the prosecution of the charges, failing to pursue the issue of the statute of limitations and that of lack of a speedy trial, and failing to object to instances of hearsay.
Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052, sets forth the standard to which this court uniformly subscribes in reviewing a claimed denial of the right to the effective assistance of counsel. The United States Supreme Court in Strickland noted that a reviewing court must give great deference to trial counsel's performance, and that a presumption exists that counsel's actions may comport with what might be considered sound trial strategy. The Court then offered the following:
 The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.
* * *
 The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
Id. at 686, 694, 104 S.Ct. at 2064, 2068.
 When all of the aspects of this case are considered, it cannot reasonably be said that Jones's counsel did not render effective assistance before or during his trial. The extraordinary hiatus between the events that led to the accusations and Jones's arrest imposed significant handicaps on his lawyers. They were required to follow a cold trail, one chiefly occasioned by Jones's willful absence from Ohio. They had to represent what appears to have been a recalcitrant client, one who had given a delusional story about being struck senseless by a stranger, and one who, in retrospect, had foolishly rejected two bargains distinctly favorable to him. Jones offered no defense to the assaults. And his decision not to testify to bolster his defense of self-defense but, instead, to rely upon his trial counsel's adroit exploitation of the presence of a fragment of a tooth on the floor at the scene of the homicide to carry the day, clearly was a handicap of Jones's own creation.
Our review of the reasons for the numerous continuances convinces us that they were not unreasonable in light of the totality of the circumstances. In the end, the jury's finding that Jones was not guilty of murder, but guilty of voluntary manslaughter, is compelling evidence that his trial counsel was effective.
For the reasons given, the seventh assignment is overruled.
The eighth assignment is as follows:
 The trial court erred in violation of appellant's right to due process of law and equal protection under the Fourteenth Amendment in overruling his challenges to the prosecution's use of a peremptory challenge to excuse an African-American juror.
 This court, in State v. Walker (2000), 139 Ohio App.3d 52, 55, 742 N.E.2d 1173, 1175-1176, set down the basic principles that control the resolution of the legal issue posed by this assignment, one predicated on Batson v. Kentucky (1986), 476 U.S. 79, 106 S.Ct. 1712:
 In Batson, the United States Supreme Court recognized that the Equal Protection Clause of the Fourteenth Amendment, United States Constitution, precludes purposeful discrimination by the state in the exercise of its peremptory challenges so as to exclude members of minority groups from service on petit juries. See id. at 89, 106 S.Ct. at 1719, 90 L.Ed.2d at 82-83; see, also, State v. Hernandez (1992), 63 Ohio St.3d 577, 581, 589 N.E.2d 1310, 1313. Jury service is one of the most important rights and duties of a citizen. As the Fourteenth Amendment protects the rights of prospective jurors to be free from discriminatory challenges, the exercise of even one peremptory challenge in a purposefully discriminatory manner would violate equal protection. See State v. Gowdy (2000), 88 Ohio St.3d 387, 393, 727 N.E.2d 579, 585; see, also, State v. White
(1999), 85 Ohio St.3d 433, 436, 709 N.E.2d 140, 147.
 To establish a prima facie case of purposeful discrimination, a defendant must demonstrate (1) that members of a cognizable racial group were peremptorily challenged and (2) that the facts and any other relevant circumstances raise an inference that the prosecutor used the peremptory challenges to exclude jurors on account of their race. See State v. Johnson (2000), 88 Ohio St.3d 95, 116, 723 N.E.2d 1054, 1073. If a defendant makes a prima facie case of discrimination, the state must then provide a race-neutral explanation. See State v. Hill (1995), 73 Ohio St.3d 433, 445, 653 N.E.2d 271, 282. A trial court's finding of no discriminatory intent will not be reversed on appeal absent a determination that it was clearly erroneous. See State v. Hernandez, 63 Ohio St.3d at 583, 589 N.E.2d at 1314.
 Accord State v. Adams (Aug. 24, 2001), Hamilton App. Nos. C-000388, C-000389 and C-000390, unreported; State v. Hobbs (May 25, 2001), Hamilton App. No. C-000516, unreported; State v. Gatewood (Dec. 22, 2000), Hamilton App. No. C-000157, unreported. As the United States Supreme Court pointed out in State v. Hernandez, supra, the core question is the facial validity of the prosecutor's explanation for the peremptory challenge.
Here, one African-American was challenged because, as the prosecutor explained, the prospective juror had stated his belief that he had unjustifiably been cited by police for a traffic violation, had admitted that he had a cousin who stood convicted of murder, and had been "unusually reticent" when responding to the prosecutor's inquiries. A second African-American was challenged because, according to the assistant prosecutor, her answers to questions during voir dire had indicated that she would have had great difficulty complying with the anticipated charge to the jury, she had given incomplete personal information on the jury questionnaire, and her actions during the examination of other jurors suggested that she might have been sleeping.
The reasons given by the prosecutor were race-neutral. Therefore, we cannot say that the finding below that there was no discriminatory intent was clearly erroneous. Resultantly, the eighth assignment of error is overruled.
The judgment of the Hamilton County Court of Common Pleas is affirmed.
Hildebrandt, P.J., Painter and Shannon, JJ.
Raymond E. Shannon, retired, from the First District, sitting by assignment.
Please Note:
The court has placed of record its own entry in this case on the date of the release of this Decision.
[1] That indictment specified that the date of the assault was September 28, 1990, but the state was permitted, over the defense's objections, to amend the indictment to allege that the assaults were committed on October 12, 1990, the date upon which hospital records demonstrated that Mills had been treated for burns and injuries to her head.
[2] Jones's original trial counsel had been successful in making a "plea arrangement" in which the state would have dismissed the felonious-assault charges, and Jones would have pleaded guilty to voluntary manslaughter, would have received credit for time served while awaiting trial (fourteen months), and would have been "eligible for parole after two years, four months." The court reviewed the terms of the arrangement with Jones and his counsel on the record almost a year in advance of trial. After being told by the court that the arrangement was "probably not going to be offered later," Jones rejected it.
[3] We reserve the question of whether, under certain circumstances, a statute of limitations can be waived. See State v. Brown (1988),43 Ohio App.3d 39, 539 N.E.2d 1159.
[4] A discretionary appeal to the Supreme Court of Ohio was not allowed in State v. Sutorius (1997), 80 Ohio St.3d 1424, 685 N.E.2d 237.