[Cite as *In re Dor.B.*, 2018-Ohio-2666.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

In re Dor.B., K.B., Dom.B.

Court of Appeals No. WD-18-013

Trial Court Nos. 2015 JB 0360
2015 JB 0361
2015 JB 0362

**DECISION AND JUDGMENT**

Decided: July 9, 2018

* * * * *

Autumn D. Adams, for appellant father.

Drew A. Hanna, for appellant mother.

Paul A. Dobson, Wood County Prosecuting Attorney, and
Heather M. Baker, Assistant Prosecuting Attorney, for appellee.

* * * * *

**MAYLE, P.J.**

{¶ 1} Appellants, K.A. ("mother") and D.B. ("father"), appeal the January 30,

2018 judgment of the Wood County Court of Common Pleas, Juvenile Division, that

terminated their parental rights and granted permanent custody of their children, Dor.B.,

K.B., and Dom.B. ("children"), to appellee, Wood County Department of Job and Family Services ("JFS"). For the following reasons, we affirm.

## I. Background Facts

### A. The Family's Involvement with JFS

{¶ 2} On March 26, 2015, JFS received a report that father abused Dor.B., causing Dor.B. to "have a bruised eye and forehead." On April 17, 2015, based on the results of its investigation into the March 26 report, JFS filed complaints alleging that the children were neglected. The agency claimed that the family had been homeless and the parents were not able to meet the children's basic needs. For example, the children had no beds and few clothes and there was little food in the family's home. The complaint also alleged that mother left the family, prompting father to take the children to his brother because father claimed that he could not care for the children on his own.

{¶ 3} At a hearing on June 11, 2015, the parents, who were not represented by counsel, stipulated to the allegations in the complaints. The magistrate recommended that the children be found neglected and that temporary custody of the children be awarded to the children's paternal aunt and uncle. On June 15, 2015, the trial court adopted the recommendation.

{¶ 4} In September 2015, the aunt and uncle told JFS that they could no longer care for the children, so the parents regained custody of the children. The agency provided protective supervision services to the family when the children returned home.

2.

**{¶ 5}** On March 25, 2016, JFS sought temporary custody of the children.  The agency claimed that it was concerned that the parents could not meet the children's basic needs, the parents were arguing excessively in front of the children, two unrelated adults were living in the family's apartment, and father was using marijuana.  On March 29, 2016, the magistrate recommended that the agency take temporary custody of the children, noting that mother and father agreed to the disposition.  The trial court adopted the magistrate's decision on March 30, 2016.

**{¶ 6}** Over the next 16 months, JFS worked with the parents to help them complete the services in their case plan, but, as noted at the time of each review hearing, neither parent made satisfactory progress.  Thus, on August 25, 2017, JFS filed a motion for permanent custody of the children.  JFS alleged that the children had been in its custody for 17 consecutive months, the children could not be placed with the parents within the seven months that JFS could retain custody, and awarding permanent custody of the children to JFS was in the children's best interest.

**{¶ 7}** The motion detailed JFS's ongoing concerns with mother's inconsistent engagement in mental health and psychiatric services; her lack of an appropriate residence for the children, including her continuing to live with a registered sex offender; her inability to afford appropriate housing; and her failure to supervise the children at community visits, leading JFS to reinstate supervised visits.

**{¶ 8}** As to father, the motion outlined the agency's concerns with his inconsistent compliance with his case plan.  JFS also noted that father had asked to be removed from

3.

the case plan for a period of time before requesting to be put back on the case plan, but only to reunify with one child. He initially asked to reunify with Dor.B., but later changed his mind and asked to reunify with Dom.B. JFS said that father had appropriate housing and could meet the children's basic needs. The caseworker told father that he would need to attend weekly visits with the children and reengage in anger management and substance abuse treatment programs to move toward reunification with Dom.B. However, father did not comply with the agency's directives.

## B. The Permanent Custody Hearing

{¶ 9} The trial court held the permanent custody hearing on January 18 and 22, 2018. Mother and father both appeared and were represented by counsel. JFS presented six witnesses, including the children's guardian ad litem ("GAL"). Mother testified on her own behalf and presented two other witnesses. Father also testified on his own behalf and presented one other witness. The following facts were elicited at the hearing.

## 1. The Family's Background

{¶ 10} Prior to their involvement with JFS, the family was involved with Allen County Children Services ("ACCS"). The ACCS caseworker testified that the agency was involved with the family from March 2012 to May 2014 because the family was living in "deplorable" conditions, mother had anxiety and depression issues, father had a past diagnosis of bipolar disorder, and father was using marijuana. Dor.B. and K.B. were in ACCS's custody from March to November 2102; Dom.B. was born during this period, and ACCS obtained temporary custody of him at birth. ACCS maintained protective

4.

supervision over the family from the time the children returned home until May 2014, when the family moved to Wood County. The caseworker said that both parents completed some, but not all, case plan services and that ACCS terminated protective supervision only because the family moved out of Allen County.

{¶ 11} Two caseworkers, Amy Weaks and Melissa Tokar, were assigned to the family during their involvement with JFS. Weaks worked with the family from April 2015 to January 2017; Tokar worked with them from February 2017 to the time of the hearing. Weaks testified that the agency was working on creating a voluntary case plan with the family when mother left the home in early 2015. Father sent the children to live with his brother and sister-in-law because father said that he could not handle all three children on his own. Mother returned to the home after this, but because the parents' relationship was unstable and they had a history of domestic violence, the agency sought and received protective supervision over the children on March 11, 2015.

{¶ 12} Weaks discussed the family's first case plan, which was filed with the juvenile court on May 15, 2015. In the case plan, the agency expressed concerns with the parents' housing, the children's developmental delays, and reported physical abuse of Dor.B. As to housing, the case plan noted that the family had an apartment, but did not have living room furniture, a dining table, or beds or dressers for the children. The agency believed that the apartment lacked adequate space for seven people (the children and parents, plus two other adults who were living in the apartment to help the parents pay the rent). It was also concerned that people were visiting the apartment at "all

5.

hours." To address the housing concerns, the parents were required to apply for public assistance, work on budgeting with an agency employee during monthly home visits, have only immediate family members residing in their apartment, and obtain furniture for the home.

{¶ 13} As to the children's developmental delays, the case plan noted that the children were not involved in any assistive services prior to JFS becoming involved with the family and that Dor.B. had behavioral problems at home. The case plan required the aunt and uncle to be primarily responsible for obtaining assessments and taking the children to necessary appointments. The parents were required to attend and participate in appointments for the children as appropriate and adhere to any visitation schedule or restrictions put into place by the agency.

{¶ 14} Finally, the case plan noted that JFS received a physical abuse referral on March 26, 2015. The report alleged that father spanked Dor.B., causing Dor.B. to fall and bruise his eye and forehead. Both father and Dor.B. confirmed this version of events. Mother initially lied to the investigator and said that Dor.B. received the bruises from falling down the stairs. The investigator also noticed a cut on Dom.B.'s forehead, which mother said also came from falling down the stairs. She later told the investigator that the cut happened when Dor.B. cut Dom.B. with a razor that Dor.B. found in the bathroom. Dor.B. confirmed this version of events. To address these issues, the parents were required to refrain from physically disciplining the children and enroll in and successfully complete both agency-based and home-based parenting programs. Mother

6.

was also required to complete a mental health assessment and follow any recommendations received, and father was required to continue with the individual counseling he was already receiving.

{¶ 15} The children returned home in September 2015 after living with their aunt and uncle, but were returned to the agency's temporary custody in March 2016. Weaks said that the agency sought temporary custody of the children because it had received additional complaints that the children's basic needs were not being met, including reports that the children were hungry and dirty, the children were locked outside of the home while unsupervised, and the home was unclean. There were also concerns that father was smoking marijuana. When the agency removed the children, it filed an amended case plan with the juvenile court. The amended case plan included the requirements that both parents maintain stable housing, demonstrate their ability to provide for the children's basic needs, continue with recommended mental health services, and reengage in home-based parenting services (which the agency agreed to provide during the parents' supervised visits with the children). Additionally, the case plan required that mother obtain employment and father submit to drug screens at JFS's request.

### 2. The Parents' Compliance with the Case Plan

{¶ 16} As both caseworkers testified at the hearing, mother and father each made some progress on their case plan goals, but neither successfully completed the case plan, despite the agency's efforts. One way JFS attempted to help the parents comply with

7.

their case plan goals was by providing financial assistance. Weaks said that JFS provided the family with rent and utility payment assistance, transportation to appointments, and gas cards to defray transportation costs. Tokar elaborated that JFS provided more than $3,300 in financial assistance by purchasing beds, clothing, and school supplies for the children; buying food and household items for the family; paying for temporary housing; providing rent and deposit assistance to help the family obtain housing; and giving mother gas cards.

{¶ 17} To make it possible for the parents to complete the home-based parenting program while the children were in foster care, JFS arranged for the parenting instructor to meet with the parents during agency-supervised visits with the children.

{¶ 18} Both caseworkers also testified to regularly speaking with the parents to ensure that they understood what the case plan required and to encourage them to participate in case plan services.

### a. Mother's Progress

{¶ 19} Mother completed the required mental health assessment. She did not, however, comply with the recommendations that resulted from the mental health assessment. Tokar testified that mother's treatment providers reported that mother was not attending her appointments or taking her prescribed medicine. Mother claimed that she did not follow through with her mental health treatment because it was not helping her. She also testified that she was not attending her mental health appointments because she did not have transportation.

8.

{¶ 20} Mother also fully completed the agency-based parenting program and was actively participating in the home-based program at the time of the hearing.

{¶ 21} Moreover, mother consistently attended visits with the children and had progressed to unsupervised community visits with her children at a public library. The visits were changed back to supervised agency visits in April 2017 because of reports that mother allowed her boyfriend, a registered sex offender who was not on the agency-approved visitation list, to attend visits despite warnings from JFS that he could not be at the visits. Library personnel also expressed concerns about mother's supervision and redirection of the children during visits.

{¶ 22} As to mother's employment, she was able to find and keep jobs for periods of time. She began working at Wal-Mart in October 2016, but was fired for missing too many days of work. After that, she briefly held a factory job. Although she was not employed at the time of the hearing, mother testified that she was to begin working through a temporary agency the next week.

{¶ 23} Finally, mother failed to make any progress on her goal of obtaining and maintaining stable housing. Mother moved to Henry County in August 2016, where she lived with her boyfriend. In November 2017, the home where mother had been living was destroyed by fire. Consequently, mother, her boyfriend, and another man (whose last name mother did not know) were residing in a hotel room. Mother said that she had looked at houses, but could not rent one because she did not have money for a deposit and rent. She claimed, however, that she would be able to obtain housing for her and the

9.

children with her income from her new job and financial assistance from JFS for a deposit and first month's rent.

{¶ 24} At some point, JFS discovered that mother's boyfriend is a registered sex offender. Weaks knew that mother planned to move to Henry County with the boyfriend and testified that she had informed mother prior to the move that living with a registered sex offender would preclude reunification with the children. Tokar also told mother that she could not be reunified with the children while living with a sex offender. According to mother, her boyfriend was required to register as a sex offender because he had sex with a 15- or 16-year-old girl when he was 19 or 20 years old. Mother did not believe that her boyfriend posed any safety risk to the children. Although mother said that she would be willing to separate from her boyfriend if the children were placed with her, she had not done so at the time of the hearing.

{¶ 25} To help mother comply with her housing goal, Tokar provided mother with lists of available housing, helped her obtain money for a deposit and first month's rent, gave her information about getting funds to pay past-due utility bills, referred her to case management services in Henry County, and referred her to a homeless women's shelter that provides assistance with housing and other resources. Mother did not take advantage of these resources.

{¶ 26} Based on mother's failure to complete her case plan services, Tokar testified that JFS continued to have concerns about mother parenting the children. Specifically, mother lacked suitable housing, as she had been living in a hotel room with

10.

a registered sex offender for several months; failed to attend required mental health appointments or take her prescribed medicine; and lacked a job or any other means of providing for the children's basic needs.

### b. Father's Progress

{¶ 27} As to father's progress, JFS and father agreed that he had completed some case plan goals. Father successfully obtained and maintained employment and stable housing. He testified that he had been employed for nearly two years and said that he was in a substantially better financial position than he had been when the children were removed from the home. He also had a two-bedroom apartment and was current on his rent and utility bills.

{¶ 28} Father also completed agency-based parenting classes and was actively participating in the home-based program at the time of the hearing.

{¶ 29} Father had significant attendance issues that prevented him from completing his other case plan requirements to the agency's satisfaction. Weaks testified that father was engaged in counseling before the initial case plan was drafted and the case plan required him to continue attending counseling. At some point, father stopped attending counseling, but he later completed another mental health assessment and reengaged with mental health services. Weaks characterized father's overall attendance at his mental-health appointments as "sporadic," although she could not provide the exact number of appointments that he missed.

11.

{¶ 30} Father's second mental health assessment recommended that father enroll in substance abuse treatment. Jill Hawk, father's substance abuse counselor, testified that father did not successfully complete substance abuse treatment and characterized his attendance at appointments as "sporadic" with "unexcused absences." She believed that father made some progress, but was overall unsuccessful in substance abuse treatment. Regardless, father's drug screens consistently came back negative, despite his failure to participate in substance abuse treatment.

{¶ 31} In August 2016, father was sentenced to jail for a domestic violence incident between him and mother. JFS added anger management counseling to father's case plan even though father completed an anger management program while he was in jail. Father attended some appointments, but did not complete the program. Hawk testified from her agency's records that father attended six of 14 anger management counseling appointments.

{¶ 32} Tokar testified that father's attendance at agency-supervised visits with his children was "not consistent," but said that he had been coming to visits consistently for approximately a month and one-half before the hearing. Agency records showed that father missed 30 of 70 scheduled visits, excluding the 15 visits he missed while he was incarcerated. Some of the visits were missed because father failed to timely call JFS to confirm the visit, resulting in JFS cancelling the visits on those days.

{¶ 33} Father primarily blamed his work schedule for the missed appointments and visits. Tokar testified that father told her that he was arranging his work schedule so

12.

that he could attend appointments, but that he did not follow through. She also said that father told her that he was requesting one day a week off of work so that he could attend visits. Even after that, he did not consistently attend visits until shortly before the hearing. Tokar and father made an agreement that if father attended all of his visits and appointments (i.e., complied with all of his case plan requirements) for the month of September 2017, father would be able to have unsupervised community visits with the children. Father failed to attend all of his appointments and visits, so JFS never allowed him to progress to community visits.

{¶ 34} At the time of the hearing, JFS still had concerns about father parenting the children—despite him remedying two major areas of concern—because he failed to address his mental health issues, complete substance abuse treatment, or complete anger management counseling. In father's view, however, his only shortcoming was missing some appointments. He believed that he had remedied all of the issues that caused the children to be removed from the home because he had a job and an apartment, could provide for the children's basic needs, had not had any incidents of violence after his domestic violence conviction, and had consistently provided negative drugs screens. In short, he testified that he had accomplished all of the case plan goals, even though he had not done so exactly the way JFS demanded.

{¶ 35} Beyond father's failure to complete case plan service, JFS also questioned father's commitment to the children. Tokar said that father asked to be removed from the case plan in February 2017. At that time, he believed that adoption was in the children's

13.

best interest. In May 2017, father changed his mind and asked be added back into the case plan with the goal of reunification with Dor.B. only. Father said that he chose Dor.B. because Dor.B. was in a different foster home than his siblings and was having problems in his placements because of his behavioral issues. A month later, father told Tokar that he only wanted to work toward reunifying with Dom.B. Tokar said that father changed his mind because he did not believe he could manage Dor.B.'s behavioral issues. Tokar also said that father told her in several subsequent conversations that he could only manage one child. But in a conversation one week before the hearing, father told Tokar that he wanted to reunify with all of the children. Father explained his apparent vacillation by saying that someone at JFS told him that Dor.B. was required to have his own bedroom, but father could not afford a three bedroom apartment. Father's girlfriend, who testified on father's behalf, confirmed father's belief that he could only have custody of one child because he lived in a two-bedroom apartment. She denied that father ever said he could not afford to care for more than one child.

### 3. Potential Relative Placement

{¶ 36} At the hearing, for the first time, mother suggested that her father ("grandfather") and stepmother would be willing to care for the children and that JFS should investigate them as a potential relative placement. She said that grandfather had expressed interest in taking custody of the children for the first time the morning of the hearing. Mother planned to move to Lima to live with grandfather if he had custody of the children. Mother and the children had lived with grandfather and stepmother for a

14.

period of time before the family moved to Wood County, but the arrangement did not work out.

{¶ 37} Grandfather confirmed mother's testimony that he was willing to take custody of the children and allow mother to live with him at least for a period of time. He admitted that he had never expressed any interest in taking custody of the children before and that he told the caseworker approximately a month before the hearing that he was unable to care for the children. He said that he changed his mind because a relative who was living with him had moved out and his son was planning to move out, making room in his home for the children.

{¶ 38} Throughout the agency's involvement with the family, Weaks and Tokar asked the parents for names of relatives who might be able to care for the children and sent letters to the identified relatives. Although grandfather believed that he had received a letter from JFS, he did not tell anyone at the agency that he wanted custody of the children.

### 4. The GAL's Testimony

{¶ 39} The final witness called during the hearing was the GAL. After conducting her investigation, the GAL determined that mother was unable to provide for the children because she did not have stable housing, a job, or transportation; she was in a relationship with a registered sex offender who was convicted of "sexual misconduct with a minor"; she did not have a social support system; and she repeatedly failed to follow the case plan.

15.

**{¶ 40}** The GAL believed that father was capable of caring for one child, but not all three children. She testified that father had been making progress—his drug screens had all come back negative, his probation officer provided a positive report about him, and the people in his life had seen a change in his demeanor—and she believed that father was capable of completing his case plan goals if he was attempting reunification with just one child. She maintained this belief even though she had reviewed the records from father's service providers that showed his inconsistent attendance during the seven-month period between father being added back into the case plan and the hearing.

**{¶ 41}** The GAL admitted that she did not speak to grandfather during her investigation or investigate whether his home would be appropriate for the children because she was unaware until the day of the hearing that he was interested in having custody of the children.

**{¶ 42}** According to the GAL, the children all said that they wanted to live with mom and dad, with mom always being the first choice. The GAL's report confirmed that Dor.B. wanted to live with either parent and that Dom.B. wanted to live with father. The report also stated that the children wanted to live together (although Dor.B. sometimes said that he did not want to live with his siblings because he was afraid he would be blamed for Dom.B.'s bad behavior) and, if they remained in foster care, wanted to be the only children in their foster home.

**{¶ 43}** Based on her investigation, the GAL concluded that it would be in the best interest of the two older children to award permanent custody to JFS. She also concluded

16.

that it would be in the best interest of Dom.B., the youngest child, to return custody of him to father. Alternatively, if the court did not grant custody of Dom.B. to father, the GAL believed that it was in Dom.B.'s best interest that permanent custody be awarded to JFS.

### C. The Trial Court's Decision

{¶ 44} In its January 30, 2018 judgment entry, the trial court terminated mother's and father's parental rights and awarded permanent custody of the children to JFS. In doing so, the court found by clear and convincing evidence that the children had been in the custody of JFS for 12 or more months of a consecutive 22-month period, the children could not or should not be placed with either parent within a reasonable time, and awarding permanent custody to JFS was in the children's best interest.

{¶ 45} Pursuant to R.C. 2515.414(B)(1)(d), the court found that the children had been in the temporary custody of JFS since March 30, 2016. The motion for permanent custody was filed on August 25, 2017. The court concluded that this satisfied the statutory prerequisite requiring the children to be in the custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period.

{¶ 46} In determining that the children could not and should not be placed with the parents, the court made findings pursuant to R.C. 2151.414(E)(1) and (4).

{¶ 47} As to (E)(1), the court found that mother continuously and repeatedly failed to substantially remedy the conditions that caused the children to be placed outside of the home, despite reasonable case planning and diligent efforts by JFS. The court recognized

17.

that mother completed half of the parenting program and faithfully attended visits with the children, but found that mother "woefully failed" to address the primary areas of concern because she did not address her mental health needs, obtain or maintain suitable housing, obtain or maintain employment, or otherwise demonstrate that she was able to provide for the children's basic needs.

{¶ 48} The court further found that father continuously and repeatedly failed to substantially remedy the conditions that caused the children to be placed outside of the home, despite reasonable case planning and diligent efforts by JFS. Although father addressed the deficiencies in housing, employment, and providing for the children's basic needs that existed when the children were removed from the home, the court agreed with JFS's assessment that

> father's failure to successfully complete all components of mental health counseling, substance abuse counseling, and anger management counseling, combined with father's inconsistent visitation, should collectively result in the court finding that father has failed to satisfactorily address substantive issues giving rise to the removal of the children, despite reasonable case planning services. [JFS] suggests without full completion of the required programming and participation in visitation opportunities, there is no way to tell if father has successfully addressed the underlying issues.

18.

The court also cited father's multiple changes of heart regarding which, if any, of the children to reunify with as depriving father of "significant" time in which to develop "absolutely critical" ongoing relationships with the children.

{¶ 49} In addition to amending the case plan as the parties' needs and circumstances changed, the court determined that JFS made reasonable efforts to prevent the removal of the children from their home by:

> providing actual financial assistance for housing; providing clothing; providing food items; providing furnishings, providing school supplies for the children; offering additional financial assistance in the form of rent and utility assistance; providing gas cards and other transportation assistance to attend visits or services (including providing direct transportation via a caseworker); providing service provider referrals in multiple counties (as mother and father moved); maintaining ongoing contact with multiple service providers in order to pass along information to mother and father concerning compliance or options available; facilitating visitations and adjusting visitation times to coordinate with mother or father's services; providing budgeting assistance; and providing mother and father with "food logs" in order to assist mother and father in meeting the nutritional needs of the children. In addition, [JFS] monitored and facilitated an initial relative placement and reached out to various family members to seek out other suitable relative placements.

19.

{¶ 50} As to (E)(4), the court relied on the same facts supporting its determinations under (E)(1) to find that mother and father both demonstrated a lack of commitment to the children by other actions showing an unwillingness to provide an adequate permanent home for the children.

{¶ 51} Further, the court determined under R.C. 2151.414(D)(1) that it was in the best interest of the children to award permanent custody to JFS. Specifically, the court found that (1) father's unwillingness to engage in services required by the case plan and his ambivalence toward pursuing custody of the children outweighed the positive changes that father had made in his life; (2) father's "actions and inactions raise compelling questions as to father's priorities and raise significant concerns over father's basic ability to take steps necessary to substantially remedy the conditions giving rise to the removal of the children within any reasonable additional period of time"; (3) neither mother nor father ever successfully completed a case plan during the five years the family was involved with ACCS and JFS; (4) the children have a bond and wish to live together, which had not always been possible while they were in foster care because of their behavioral issues; (5) Dor.B. wanted to live with mother or father; (6) Dom.B. wanted to live with father; (7) the GAL recommended that temporary custody of Dom.B. remain with JFS to continue working on reunifying Dom.B. with father and that permanent custody of Dor.B. and K.B. be awarded to JFS; and (8) the children need permanency that can only be achieved by awarding JFS permanent custody. The court noted that it "cannot sit by and assume or hope that things will work out with mother and father. It is

20.

not in the best interest of the children to allow mother and father more time in the hopes that things may change—particularly given the lengthy history of this matter and the 'track record' to date of the parties."

{¶ 52} After considering all of the evidence and making thorough, detailed, and extensive findings, the trial court awarded permanent custody of all three children to JFS and terminated mother's and father's parental rights.

### D. The Appeals

{¶ 53} Both parents appeal the trial court's decision. Father sets forth the following assignment of error:

> The Trial Court's decision to award permanent custody to the Agency is against the manifest weight of the evidence when Appellant has substantially remedied the conditions which caused the Minor Children to be removed from his home and his mental illness and past drug usage do not prevent Appellant from being able to provide an adequate permanent home.

{¶ 54} In her appeal, mother raises six assignments of error:

> FIRST ASSIGNMENT OF ERROR: THE COURT IS IN ERROR IN FINDING THERE IS CLEAR AND CONVINCING EVIDENCE IT IS IN THE BEST INTEREST OF THE CHILDREN TO BE PLACED IN THE PERMANENT CUSTODY OF THE DEPARTMENT OF JOB AND FAMILY SERVICES.

21.

SECOND ASSIGNMENT OF ERROR:  IT IS ERROR FOR THE COURT TO GRANT PERMANENT CUSTODY OF THE CHILDREN TO THE DEPARTMENT OF JOB AND FAMILY SERVICES, BY REASON OF [MOTHER] LIVING WITH AUSTIN COX.

THIRD ASSIGNMENT OF ERROR:  IN THE ALTERATIVE TO PLACEMENT WITH [MOTHER], IT IS ERROR FOR THE COURT NOT TO PLACE THE CHILDREN WITH THEIR MATERNAL GRANDFATHER, * * *.

FOURTH ASSIGNMENT OF ERROR:  IT IS ERROR FOR THE COURT NOT TO REQUIRE THE COURT APPOINTED SPECIAL ADVOCATE TO EVALUATE PLACEMENT OF THE CHILDREN WITH [MOTHER'S] FATHER, * * *.

FIFTH ASSIGNMENT OF ERROR:  IN EVALUATING THE BEST INTERESTS OF THE CHILDREN, THE COURT FAILS TO GIVE PROPER CONSIDERATION TO [MOTHER] AS THE MOTHER AND "PRIMARY CAREGIVER" FOR THE CHILDREN.

SIXTH ASSIGNMENT OF ERROR:  IT IS ERROR FOR THE COURT TO ADMIT EXHIBITS 17 AND 18, SINCE THESE EXHIBITS DO NOT MEET THE HEARSAY EXCEPTION OF EVID. R. 803(6).

## II. Law and Analysis

{¶ 55} In his assignment of error, father argues that the trial court's determination that the children cannot or should not be placed with him in a reasonable time was against the manifest weight of the evidence because he substantially remedied the conditions that caused the children to be removed from the home. JFS contends that father's changing desires regarding custody of the children and his failure to complete case plan objectives is competent, credible evidence that the children cannot or should not be returned to father within a reasonable period of time.

{¶ 56} Mother's first, third, fourth, and fifth assignments of error essentially argue that the trial court's best interest determination was against the manifest weight of the evidence. JFS responds that the evidence clearly and convincingly shows that awarding permanent custody to JFS was in the children's best interest. In her second assignment of error, mother claims that the trial court erred in awarding permanent custody to the agency based on mother's cohabitation with a registered sex offender. JFS counters that mother living with a registered sex offender was not the sole basis for the court's decision, but was one factor that the court considered in determining that mother had not obtained suitable housing. Finally, in her sixth assignment of error, mother argues that the trial court erred in admitting exhibit Nos. 17 and 18 because they do not qualify as business records under Evid.R. 803(6). JFS responds that the trial court properly admitted the exhibits for the purpose of showing mother's and father's attendance at agency-supervised visits.

23.

{¶ 57} We address each argument in turn.

**A. The Trial Court's Admission of Exhibit Nos. 17 and 18 was Harmless Error**

{¶ 58} We first consider mother's sixth assignment of error, in which she challenges the trial court's admission of exhibit Nos. 17 and 18 under the business records exception to the hearsay rule. We find that the trial court erred in admitting the exhibits, but the error was harmless.

{¶ 59} Exhibit No. 17 consists of a list of dates that mother was scheduled to attend supervised visits with the children at JFS. It also contains comments about mother's interactions with the children and "concerns" the agency had with the visits. Exhibit No. 18 consists of the same information for father. At the hearing, Tokar testified that she prepared the exhibits using the agency's records. She also said that the fact of a parent's attendance and any observations about the visit are documented by the worker supervising the visit (not the family's caseworker) in the ordinary course of the agency's business. Although some of the notes on the exhibits are Tokar's notes, she did not make the subjective observations about the visits; she merely compiled them from agency records. The court took the exhibits under advisement at the hearing. In its judgment entry, the trial court found that the exhibits did not satisfy the exception in Evid.R. 803(6) because they were not JFS's actual records, but were summaries compiled by Tokar for use at the hearing. Regardless, the trial court admitted the exhibits to the extent that they reflected mother's and father's actual attendance at visits, which, the court noted, was

24.

undisputed.  The court excluded the subjective observations about the visits that were reflected in the exhibits.

{¶ 60} "On appeal, challenged hearsay is subject to de novo review under the applicable hearsay rule, rather than the more deferential review employed for discretionary rulings" because "[w]hile there is discretion to admit or exclude relevant evidence, there is no 'discretion' to admit hearsay."  *State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442, ¶ 29, 32 (6th Dist.), citing *State v. Sutorius*, 122 Ohio App.3d 1, 7, 701 N.E.2d 1 (1st Dist.1997); and *State v. Sorrels*, 71 Ohio App.3d 162, 165, 593 N.E.2d 313 (1st Dist.1991).

{¶ 61} The Ohio Supreme Court has identified the requirements to establish admissibility of records under Evid.R. 803(6), the business record exception to the hearsay rule:

> "To qualify for admission under Rule 803(6), a business record must manifest four essential elements:  (i) the record must be one regularly recorded in a regularly conducted activity; (ii) it must have been entered by a person with knowledge of the act, event or condition; (iii) it must have been recorded at or near the time of the transaction; and (iv) a foundation must be laid by the 'custodian' of the record or by some 'other qualified witness.'"  Weissenberger, Ohio Evidence Treatise (2007) 600, Section 803.73.  Even after these elements are established, however, a business record may be excluded from evidence if "the source of information or the

25.

method or circumstances of preparation indicate lack of trustworthiness."

Evid.R. 803(6).  State v. Davis, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 170.

{¶ 62} Tokar, who testified as the "custodian" or "other qualified witness," specifically said that the exhibits were not JFS records, but that she compiled them for purposes of the permanent custody hearing.  Thus, on their faces, exhibit Nos. 17 and 18 do not qualify as business records because they are not records "regularly recorded in a regularly conducted activity."  *Id.*  Accordingly, the trial court erred in admitting any portion of the exhibits.  We find that the error was harmless, however, because Tokar, who had detailed personal knowledge of the case and the parties, testified about the parents' attendance records, and the attendance information in exhibit Nos. 17 and 18 was cumulative to her testimony.  Therefore, we find that mother's sixth assignment of error is not well-taken.

## B.  Law of Permanent Custody

{¶ 63} The remaining assignments of error relate to the trial court's application of R.C. 2151.414.  The statute provides the analysis that a juvenile court must undertake when considering whether to terminate parental rights and vest permanent custody in a children services agency.  First, the court must find that one of the circumstances described in R.C. 2151.414(B)(1)(a)-(e) exists.  Subsection (a) requires a finding that the child has not been abandoned or orphaned, has not been in the custody of a public children services agency or a private child placing agency for at least 12 months of a

26.

consecutive 22-month period, and cannot be placed with either parent within a reasonable time or should not be placed with either parent; subsection (b) requires a finding that the child is abandoned; subsection (c) requires a finding that the child is orphaned and there are no relatives who are able to take permanent custody; subsection (d) requires a finding that the child has been in the temporary custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period; and subsection (e) requires a finding that the child or another child the parent had custody of has been adjudicated abused, neglected, or dependent on three separate occasions.

{¶ 64} If the court finds that R.C. 2151.414(B)(1)(d) applies, its next step is considering whether granting permanent custody to the agency is in the child's best interest by considering the factors in R.C. 2151.414(D)(1). *In re I.D.*, 6th Dist. Lucas No. L-13-1162, 2014-Ohio-238, ¶ 25.

{¶ 65} If the court finds that R.C. 2151.414(B)(1)(a) applies, it must consider both whether granting permanent custody to the agency is in the child's best interest *and* whether any of the factors enumerated in R.C. 2151.414(E) are present that would indicate that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re B.K.,* 6th Dist. Lucas No. L-10-1053, 2010-Ohio-3329, ¶ 42-43. If the court finds that at least one factor in R.C. 2151.414(E) applies, it must then determine whether awarding permanent custody to the agency is in the child's best interest by considering the factors in R.C. 2151.414(D)(1).

27.

**{¶ 66}** All of the court's findings under R.C. 2151.414 must be by clear and convincing evidence. "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re Tashayla S.*, 6th Dist. Lucas No. L-03-1253, 2004-Ohio-896, ¶ 14.

**{¶ 67}** We review a trial court's determination in a permanent custody case under a manifest-weight-of-the-evidence standard. *In re P.W.*, 6th Dist. Lucas No. L-12-1060, 2012-Ohio-3556, ¶ 20. In doing so, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). But while we review the evidence and consider the witnesses' credibility, we must be mindful that the juvenile court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *P.W.* at ¶ 20. Its discretion in determining whether an order of permanent custody is in the best interest of a child "'should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" (Internal citations omitted.) *In re C.P.,* 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 10.

28.

**C. Granting Permanent Custody to JFS was in the Children's Best Interest**

{¶ 68} Mother's first, third, fourth, and fifth assignments of error all broadly relate to the trial court's determination that awarding JFS permanent custody was in the children's best interest. We believe that the trial court's decision is supported by the manifest weight of the evidence.

{¶ 69} In making a best interest determination, R.C. 2151.414(D)(1) requires the court to consider all relevant factors, including:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 70} The trial court's judgment entry shows that the court carefully and fully considered whether awarding permanent custody to JFS was in the children's best

interest.  Regarding subsection (a), the court took into account the children's bond with each other, their desire to live together, and the difficulties that they had experienced in their foster homes.

{¶ 71} As to subsection (b), the court considered the children's wishes regarding custody, as relayed to the GAL, while being mindful that the children were 7, 6, and 5 years old.

{¶ 72} For subsection (c), the court outlined the children's tumultuous custodial history, which included:  father placing them with a relative; the relative being unable to care for them any longer and returning them to the parents; being removed from the parents only six months later; Dor.B. being separated from the other siblings while in foster care; and all of the children being placed in several foster homes while JFS had temporary custody.

{¶ 73} As to subsection (d), the court found that the children could not achieve a legally-secure placement unless JFS received permanent custody because the children had been in and out of the custody of both ACCS and JFS for five years and the parents had not made sufficient progress toward remedying the circumstances that caused the children to be removed from the home, despite having nearly two years to do so.

{¶ 74} Additionally, the court considered the GAL's recommendations for custody of the children, the parents' successes with their case plan objectives, and father's ambivalence about parenting the children—including the court's assessment that father's desire to reunify with one child (first Dor.B., then Dom.B.) was not related to his

30.

apartment being too small, but related to father's perception of his relationship with the chosen child and his ability to handle the child's behavioral issues.

{¶ 75} In short, the trial court had substantial competent, credible evidence before it to support its best interest determination. Accordingly, mother's first assignment of error is not well-taken.

{¶ 76} Mother also faults the trial court for failing to either place the children with grandfather or order the GAL to investigate grandfather's suitability as a caretaker for the children. The availability of relative placement options is one of "all relevant factors" a trial court must consider when deciding if granting permanent custody to a children services agency is in a child's best interest under R.C. 2151.414(D). *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 63. The statute does not require the trial court to find that no suitable relative was available for placement. *Id.* Indeed, "[t]he statute does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than other factors." *Id.*

{¶ 77} Here, competent, credible evidence supports the trial court's determination that placing the children with grandfather was not in their best interest. The court noted that JFS attempted to locate a suitable relative with whom to place the children by asking the parents for the names of relatives who might be able to care for the children and sending letters to potential relative placements. Mother did not suggest grandfather as a potential placement at that time, and grandfather did not respond to JFS's letter of

31.

inquiry. Instead, on the day of the hearing, mother surprised both JFS and the GAL by asking the court to place the children with grandfather. Tokar, mother, and grandfather all testified that as little as three weeks before the hearing, grandfather was unwilling to take the children due to marital strife. The only circumstance that changed by the time of the hearing was that a relative living in grandfather's home moved out and his son was planning to move out. Moreover, grandfather testified that he was not aware of some of the children's behavioral issues.

{¶ 78} Based on this evidence, we find that the trial court properly weighed grandfather's availability as a caretaker as one of "all relevant factors" when considering the best interest of the children pursuant to R.C. 2151.414(D), and that competent, credible evidence supports the trial court's conclusion that placement with grandfather was not in the best interest of the children. Therefore, we find that mother's third and fourth assignments of error are not well-taken.

{¶ 79} Finally, mother argues that the trial court failed to give proper consideration to the fact that mother was the children's primary caregiver. Mother supports her argument with several cases regarding a court's allocation of parental rights and responsibilities between two parents. These cases are inapplicable in the context of an award of permanent custody to a children services agency under R.C. 2151.414. To the extent that consideration of the children's primary caregiver constitutes a "relevant factor" under R.C. 2151.414(D), we find that competent, credible evidence supports a finding that mother was not, in fact, the children's primary caregiver for nearly 17

32.

months before the permanent custody hearing. Mother did not have custody of the children during that time and only saw the children for two hours once a week. Mother's fifth assignment of error is therefore not well-taken.

### D. The Trial Court's Finding that Mother Lacked Suitable Housing was Supported by the Manifest Weight of the Evidence

{¶ 80} In her second assignment of error, mother argues that the trial court erred when it terminated her parental rights based on her residing with a registered sex offender. As JFS correctly points out, however, mother's roommate was not the sole reason that the trial court terminated mother's parental rights. Rather, it was one factor that the trial court considered when determining that mother did not have suitable housing for the children. Beyond the undisputed fact that mother was living with a registered sex offender who was convicted of "sexual misconduct with a minor," the trial court also considered that mother moved in with her boyfriend despite being told that living with a sex offender would preclude her from reunifying with the children; was living in a hotel room with two other adults (one of whom is a sex offender and the other whose last name she did not know) at the time of the hearing; chose not to take advantage of numerous housing resources that JFS provided to her; had no realistic, readily available housing options that would accommodate her and the children; and did not have a job that would enable her to afford housing for her and the children. In short, the trial court did not terminate mother's parental rights simply because she lives with a sex offender. There was significant competent, credible evidence that mother did not have

33.

suitable housing for the children.  Consequently, we conclude that the trial court's decision about mother's housing is supported by the manifest weight of the evidence. Mother's second assignment of error is therefore not well-taken.

### E.  The Trial Court's R.C. 2151.414(E) Findings Regarding Father are Supported by the Manifest Weight of the Evidence

{¶ 81} In his sole assignment of error, father argues that the trial court's decision to grant permanent custody of the children to JFS was against the manifest weight of the evidence because father substantially remedied the conditions causing the removal of the children from the home.  JFS responds that competent, credible evidence of father's failure to comply with the case plan and his multiple changes of heart regarding having custody of the children support the trial court's decision.  We agree with JFS.

{¶ 82} Here, the trial court found that R.C. 2151.414(B)(1)(a) applies, so it examined the R.C. 2151.414(E) factors.  "[A] court need only find one factor under R.C. 2151.414(E) to support a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent * * *." *In re Carlos R.*, 6th Dist. Lucas No. L-07-1194, 2007-Ohio-6358, ¶ 38.  In this case, the court found that R.C. 2151.414(E)(1) and (4) were applicable to father:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and

34.

repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child * * *.

{¶ 83} The evidence before the trial court showed that father made significant progress in some of the areas that the case plan addressed. Specifically, father found and kept a job, found and kept an apartment, and had the means to provide for the children's basic needs. The evidence also showed that father failed to consistently participate in the mental health, substance abuse, and anger management counseling that were required as part of the case plan—i.e., failed to utilize the "rehabilitative services and material resources" made available to him—and failed to attend a significant number of visits with the children. And there was evidence of father's ambivalence regarding having custody of some or all of his children, which the trial court found particularly troubling.

35.

{¶ 84} Although the trial court commended father for remedying some of the conditions causing the children to be removed from the home—namely stable housing, stable employment, and the ability to provide for the children's basic needs—the court concluded that JFS's evidence that father was not participating in services and did not successfully complete the counseling JFS required was more credible than father's evidence that he no longer had mental health, substance abuse, or anger issues. Giving deference to the trial court's factual determinations, we find that the court's conclusion is supported by competent, credible evidence.

{¶ 85} Based on the same evidence, the trial court concluded that father's actions and inactions showed that he lacked commitment to the children. This is supported by the fact that father refused, despite numerous requests from JFS, to engage in services and attend visits with the children. For example, Tokar testified that she agreed to allow father to have unsupervised community visits with the children if he attended all case plan service appointments and visits for one month. Father failed to attend all of the appointments and visits. His only explanation for his absences was his work schedule. Again, the trial court found JFS's evidence more credible than father's. And again giving deference to the trial court's factual determinations, we find that some competent, credible evidence in the record supports the trial court's conclusion that father's actions and inactions demonstrate a lack of commitment to the children.

{¶ 86} In sum, competent, credible evidence supports the trial court's finding under R.C. 2151.414(E)(1) that father failed to substantially remedy the conditions

causing the children to be placed outside of the home and its finding under R.C. 2151.414(E)(4) that father demonstrated a lack of commitment to the children by failing to participate in the services that would have allowed them to be reunified. Accordingly, we find that the trial court properly awarded permanent custody of the children to JFS. Father's assignment of error is not well-taken.

### III. Conclusion

{¶ 87} This court has thoroughly reviewed the record of proceedings in the trial court, including the trial testimony and exhibits. We find that the trial court's decision was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Mother's and father's assignments of error are without merit.

{¶ 88} Therefore, the January 30, 2018 judgment of the Wood County Court of Common Pleas, Juvenile Division, is affirmed. Costs of this appeal shall be divided equally between mother and father pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

37.

Mark L. Pietrykowski, J.

Thomas J. Osowik, J.

Christine E. Mayle, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.