[Cite as *State v. Holmes*, 2019-Ohio-896.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio

     Appellee

v.

Mark Holmes

     Appellant

Court of Appeals No. L-17-1111

Trial Court No. CR0201603032

**<u>DECISION AND JUDGMENT</u>**

Decided: March 15, 2019

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Lauren Carpenter, Assistant Prosecuting Attorney, for appellee.

Clayton M. Gerbitz, for appellant.

* * * * *

**MAYLE, P.J.**

{¶ 1} Following a jury trial, appellant, Mark Holmes, appeals the April 24, 2017 judgment of the Lucas County Court of Common Pleas sentencing him to seven years in prison for convictions of rape, domestic violence, and endangering children. For the following reasons, we affirm.

## I. Background and Facts

{¶ 2} This case stems from incidents on October 28 and 29, 2016, involving Holmes and S.J., the mother of his child. On November 7, 2016, Holmes was indicted on five charges, including one count each of rape in violation of R.C. 2907.02(A)(2), a first-degree felony; kidnapping in violation of R.C. 2905.01(A)(3), a first-degree felony; domestic violence in violation of R.C. 2919.25(A), a first-degree misdemeanor; endangering children in violation of R.C. 2919.22(A), a first-degree misdemeanor; and inducing panic in violation of R.C. 2917.31(A)(3), a fourth-degree felony. The state dismissed the kidnapping and inducing panic charges prior to trial. The following facts were adduced at trial.

### A. S.J.'s Testimony

{¶ 3} Around 9:00 p.m. on the evening of October 28, 2016, S.J. returned from work to the home that she and Holmes shared with their son and a roommate. Although the couple lived together and had been romantically involved, S.J. said that they were not "technically in a relationship" at that time.

{¶ 4} S.J. said that everything was normal when she got home, but after she put their child to bed, Holmes asked her "what I've been doing" and began hitting her when she told him she did not know what he was talking about. At that point, S.J. did not know why Holmes was angry with her, but believed that it may have been because he discovered that she was involved in relationships with other men. She testified that

2.

Holmes first hit her with his hands, but he eventually switched to hitting her on the arms with a belt.

{¶ 5} While Holmes was hitting S.J., the child woke up and began crying. S.J. asked Holmes to stop hitting her, but he refused; he even continued hitting her while she was holding the child. The child was crying so much that he vomited on S.J., which caused Holmes to briefly stop beating her. Holmes smeared the child's vomit in S.J.'s face and told her to clean up the child.

{¶ 6} While S.J. was bathing the child, Holmes urinated in her hair, which S.J. described as "[d]isgusting." Holmes then ordered her to shower. She complied, but she was unable to wash her hair because the child was still with her, so she was rushing.

{¶ 7} Following the shower, Holmes allowed S.J. to put on underwear but no other clothing "[b]ecause [Holmes] said he just wanted me in underwear." S.J. remained in only her underwear for the rest of the night. S.J. testified that at this point "I was afraid, but I just mostly just—I just wanted to get through the night I guess." When the prosecutor asked if S.J. would "do anything" to get through the night, S.J. responded "no."

{¶ 8} Holmes next told S.J. to put the child, who was still quite upset, to bed. S.J. believed that Holmes would hit her if she did not get the child to sleep. After the child fell back to sleep, Holmes told S.J.—who was still wearing nothing but underwear—to clean the house. She testified that she washed the dishes, mopped the kitchen floor, cleaned the child's vomit off of the couch, and picked up her and the child's soiled

3.

clothing. S.J. said that she did not want to clean, but "[i]t was better than getting hit * * *."

{¶ 9} Later, Holmes took S.J. back into the bathroom, urinated into a mug, and forced her to drink his urine. He threatened to beat her with his fists if she did not. Again, S.J. complied.

{¶ 10} After that, Holmes and S.J. went back to the living room where Holmes recorded videos of him interrogating S.J. about her other relationships while S.J., still wearing nothing but her underwear, kneeled on the floor in front of him. S.J. believed that he made the videos either to ward off other men or to ensure that he was able to recoup his half of the money that they spent on a car.

{¶ 11} The first video was recorded at 8:47 p.m. and lasted for approximately 15 minutes. In it, Holmes demanded that S.J. tell him the names of the men she was involved with and describe the sexual activity they engaged in. He made degrading comments to S.J. throughout the video, calling her a "slut" and a "ho," and said that she was "crying" and "playing the victim role." He also made derogatory comments to the men with whom S.J. had been involved. For example, he said to one man, "Man, you suck * * *. You couldn't fuck this bitch?" and to another "you got a bitch on your hands, bro * * *." S.J. spoke very softly and looked upset, nervous, and afraid throughout the video. At one point, when Holmes reached for a pillow, S.J. visibly flinched and raised her arms as if to block her face. Holmes told S.J. that she "should be sitting there scared, ashamed of yourself, bitch * * *." The video ended in the middle of a tirade from

4.

Holmes about the "privileges" (such as the use of the car that Holmes and S.J. jointly purchased) that Holmes was taking away from her because of her behavior.

{¶ 12} The second video was recorded at 9:42 p.m. and lasted for approximately 19 minutes. Although the state only had two videos of Holmes interrogating S.J., at the beginning of the second video, Holmes referred to the recording as "part five" and said that S.J. was "still playing the victim role, but she's confessing * * *." Approximately 30 seconds into the recording, Holmes gets up and throws a towel at S.J., who wraps it around her shoulders. Again, Holmes demands the names of S.J.'s other partners and the details of their sexual activity and makes degrading comments to S.J., such as calling her "ugly" and "a dumb cunt that would fuck anybody." Near the end of the video, the child begins crying. Holmes takes him a bottle and then says to S.J., "You got me waking my son up 'cause you don't know how to act." He finally ended the video when he decided that "I don't even need to go no further." Again, S.J. spoke very softly and looked upset and nervous in the video.

{¶ 13} When Holmes finished interrogating and recording S.J., she said that they smoked marijuana and discussed the status of their relationship for 30 minutes to an hour. Specifically, they talked about how to make their relationship work going forward. S.J. said that Holmes had calmed down, and she was no longer afraid of him.

{¶ 14} Following this conversation, S.J. testified that Holmes asked her to perform fellatio on him and recorded her doing so. The video was recorded just after midnight on October 29, 2016, and lasted for approximately three and one-half minutes. Holmes can

5.

be heard on the video talking to a man named in one of the earlier videos and telling S.J. how to fellate him. This sex act was the basis of the rape charge against Holmes.

{¶ 15} According to S.J.'s trial testimony, she willingly agreed to perform fellatio on Holmes "[b]ecause I wanted to." She recalled that Holmes asked "'[S.J.], will you give me some head?' I believe, or something like that * * *. I just looked, and then he said, 'You don't have to do it. You don't have to be afraid. I'm not going to hit you. Nothing is going to happen.'" She claimed that they would commonly make up after fighting by engaging in sexual activity. She also said that recording their sexual activity was something that Holmes had done before. She recalled Holmes saying that he loved her or something similar while she was fellating him.

{¶ 16} After the fellatio was finished, the couple fell asleep on the couch around 4:00 or 5:00 a.m.

{¶ 17} Around 9:00 a.m. on October 29, Holmes woke S.J., told her that they were going to run errands, and said that she needed to "look nice" or be presentable to go out with him. He also told her that she could not go to work that day because she was too distraught. S.J. agreed to call off of work. While they were out, S.J. texted her cousin to tell the cousin that she and Holmes had been fighting all night, so she would not be at work. She also claimed that she told her cousin that Holmes had hit her the night before, but did not say anything else about the events. The cousin asked S.J. what was going on and then "kept trying to call," but S.J. told the cousin that she could not talk. S.J. denied

6.

being afraid of Holmes at this point and said that she did not want to run away or leave, even when Holmes left her and the child alone in the car.

{¶ 18} S.J. said that nothing unusual happened once she and Holmes returned from their errands. Later in the day, however, S.J.'s mother, sister, cousin, and several other relatives (about 15 to 20 people total) came to S.J. and Holmes's house, ostensibly to ask about taking the child to a birthday party that afternoon. Holmes, S.J., and the child were outside with S.J.'s relatives and S.J.'s mother was holding the child when, S.J. believed, her mother said something to Holmes that agitated him, prompting Holmes to demand that she give him the child. Her mother did, and Holmes took the child back into the house. S.J. got into her cousin's car. She said that she was feeling tired, confused, "afraid of what was going to happen next," and "scared that something would happen and that my son would see it" because her family had called the police.

{¶ 19} When the police arrived, S.J. said that she was "distraught" because she had been in two police raids before and seeing "people running with dogs and guns the size of me * * *" scared her. At this point, she said, the officers did not ask her about the events of the night before, but were asking questions about Holmes and the layout of the house to try to get him and the child out of the house safely.

{¶ 20} While police were still at the house, S.J. asked to go to the hospital because she was dizzy. Once she arrived at the hospital, hospital staff wanted to perform a sexual assault examination because it "was normal with a case like this," even though S.J. testified that she "specifically told everyone that I did not feel that I was sexually

7.

assaulted and that this was not a sexual assault * * *." She also claimed that she "would have 100 percent refused" a sexual assault examination if she had known at the time that it would lead to rape charges being filed against Holmes. She was adamant that she never told police or medical personnel that she was "raped, forced or made to do anything."

{¶ 21} Despite that, S.J. agreed to the exam and signed a consent form for the exam that the state introduced at trial. The first line of the form read, "I have been sexually assaulted and voluntarily consent to this medical forensic examination and collection of evidence." The form also showed that S.J. initialed it in two places and signed it at the bottom. S.J. said that the sexual assault nurse examiner ("SANE") who conducted the exam reviewed the form with her before she signed it. Even so, S.J. claimed that she did not read it and no one explained its contents to her.

{¶ 22} A rape crisis advocate from the YWCA came to the hospital and gave S.J. information about sexual assault and domestic violence. S.J. claimed that she told the advocate that "'I don't need this information. You can give me this stuff about the domestic violence, but the sexual assault, I don't need that. I wasn't sexually assaulted.'"

{¶ 23} S.J. also denied telling police that Holmes had sexually assaulted her. She believed that the police concluded on their own that she had been raped, based on the information that she provided.

{¶ 24} On the day that Holmes's case was presented to the grand jury, S.J. met with detective Diana Trevino of the Toledo Police Department ("TPD") to discuss the

8.

case. S.J. had a rape crisis advocate with her. She claims that she told Trevino that she believed domestic violence happened on October 28 and domestic violence charges were appropriate, but she did not agree with the rape charge because she was not raped.

{¶ 25} Just over a month after Holmes was indicted, S.J. began sending letters to the prosecutor and the trial court asking to have the rape charge dismissed. Even though the timing of the letters coincided with S.J. beginning to accept phone calls from Holmes (who was in jail), S.J. insisted that she wrote the letters of her own volition and that Holmes did not tell her to write them or intimidate or threaten her in any way. When the letters did not work, she became frustrated and did not want to cooperate with the prosecution because she "felt like my voice was not being heard."

### B. Additional Testimony About the Events of October 28

{¶ 26} At the trial, S.J. steadfastly maintained that Holmes did not force her to perform fellatio on him. To counter her testimony, the state presented the testimony of TPD sergeant Kellie Lenhardt, officer Denise Fischer, and detective Diana Trevino, and SANE Joleen Jimenez.

### 1. Sergeant Lenhardt

{¶ 27} Lenhardt was on the negotiation team that responded to S.J. and Holmes's house on October 29. She said that a negotiation team was called in because of a report that a woman who had been held against her will and raped repeatedly had escaped from the home, but that her child was still inside with the man who raped her. The man reportedly had "numerous firearms." Lenhardt was the intelligence officer on the team,

which required her to gather information "to help everybody come out of the crisis safely * * *." She tried to get information about Holmes from S.J., but was unable to because S.J. was "so distraught." She elaborated that S.J. was "lying down in the backseat of a civilian vehicle clearly distraught. She was crying, sobbing almost to the point where you couldn't understand when she spoke. Her knees were up to her chest in a fetal position, and she had her friends and family around her, around the vehicle." Although S.J. did not answer questions, she allowed the negotiators to use her cellphone to contact Holmes.

## 2. Officer Fischer

{¶ 28} Fischer was one of the first officers to respond to S.J. and Holmes's house on October 29 on a call about a man barricaded in a house with a small child. She said that the incident lasted "several hours."

{¶ 29} When the standoff ended, Fischer went to the hospital to speak to S.J. She described S.J. as "visibly shaking" and said that she cried at different points in her story.

{¶ 30} Over Holmes's objection, the trial court allowed Fischer to testify about statements that S.J. made during the interview. The version of events that S.J. gave Fischer immediately following the incident largely mirrored S.J.'s trial testimony. There were several significant differences, however.

{¶ 31} First, in addition to the other physical harm that Holmes inflicted, S.J. told Fischer that Holmes picked her up by the shirt and threw her to the floor while she was holding the child. S.J. believed that she lost consciousness for a couple of minutes when

10.

her head hit the hardwood floor because she heard Holmes telling her to "wake up or he's going to stomp her" and opened her eyes to see his boot over her face.

{¶ 32} Next, rather than threatening to hit S.J., Fischer said that Holmes threatened to kill her if she did not drink his urine.

{¶ 33} Finally, and most notably, instead of S.J. willingly participating in fellatio with Holmes, Fischer said that Holmes "order[ed] her to give him oral sex" and told her that he would mutilate her face, breasts, and genitals if she bit him.

### 3. SANE Jimenez

{¶ 34} Jimenez was the SANE who conducted S.J.'s sexual assault examination. She described S.J. as cooperative, tearful at times, and with a flat affect. She said that S.J.'s mother, child, and cousin were in the room during the exam, but that S.J. did not seem upset or annoyed with them and that they were not guiding S.J.'s statements or pressuring her.

{¶ 35} Usually, a victim is medically cleared by a doctor before the SANE conducts the examination. In this case, however, S.J. wanted to eat, so Jimenez procured S.J.'s consent to the exam and collected oral swabs before S.J. was medically cleared because eating might have destroyed any evidence in S.J.'s mouth.

{¶ 36} Before collecting the swabs, Jimenez reviewed the sexual assault examination consent form with S.J. Jimenez testified that she generally does not read the form to a victim; rather, she tries to explain the content of the form in words the victim will understand. Jimenez said that S.J. did not have any questions about the consent

11.

form, did not hesitate to consent to the exam, and never said that the exam was unnecessary because she had not been sexually assaulted.

{¶ 37} After Jimenez collected swabs from S.J., TPD officers asked her to collect oral swabs from Holmes. When she finished with Holmes, Jimenez completed her examination of S.J., who had been medically cleared by a doctor in the meantime. When Jimenez returned to S.J.'s room, she told S.J. that Holmes was in the hospital. Jimenez testified that the information made S.J. "unhappy. She seemed nervous, concerned, worried. I assured her that he was with police and she was safe * * *."

{¶ 38} Jimenez also took pictures of S.J.'s injuries. The photographs admitted at trial showed bruising on S.J.'s left knee, left thigh, left flank, left arm, left chest, right shoulder, right side, right elbow, right arm, and right hand; bruising and swelling on both sides of her face; and abrasions by her left eye and at her hairline. Jimenez described the bruises on S.J.'s left knee, right elbow, and right arm as "patterned" injuries from a belt. Jimenez admitted that she could not determine what caused the bruises or exactly when they happened. She also admitted that she did not see any injuries on S.J. that indicated that Holmes used force during the sexual encounter.

{¶ 39} Over Holmes's objection, the trial court, citing Evid.R. 803(4), allowed Jimenez to testify about the narrative statement that S.J. gave during the exam. Again, the majority of S.J.'s statement to Jimenez was consistent with S.J.'s trial testimony. The primary difference related to the fellatio. S.J. reported to Jimenez that Holmes "made

12.

her" perform fellatio on him and told S.J. "'You better act like you like it and don't bite me.'"

{¶ 40} Although S.J. did not use the word "rape" to describe the events, Jimenez believed that Holmes had raped S.J. Jimenez testified that, based on her training and experience, victims of domestic violence tend to minimize their abuse and rarely use the word "rape" to describe what happened to them. Jimenez claimed that nothing S.J. said made her believe that S.J. wanted to perform fellatio on Holmes or that S.J. consented to performing fellatio.

### 4. Detective Trevino

{¶ 41} Trevino was the lead investigator in this case. She arrived at S.J. and Holmes's house when S.J. was already in an ambulance waiting to go to the hospital. Trevino described S.J. as crying, shaking, and "kind of curled up a little bit into herself." Trevino said that she asked S.J. if she had been sexually assaulted, to which S.J. replied, "'No, he didn't rape me. He just made me blow him.'" According to Trevino, this was the only time on October 29 that S.J. denied being raped. Trevino determined that she would continue with a rape investigation and followed S.J. to the hospital for a more in-depth interview.

{¶ 42} When Trevino saw S.J. at the hospital, S.J. was still crying and shaken. During the interview, S.J. told Trevino the details of Holmes's behavior on October 28. S.J.'s statements, as conveyed by Trevino, were generally consistent with S.J.'s trial testimony except with respect to the fellatio.

13.

**{¶ 43}** Regarding the events prior to the sex act, Trevino added several details to S.J.'s trial testimony. Trevino testified that Holmes was angry at S.J. when she came home because he had seen some sexual Facebook messages between S.J. and other men. During the beating, S.J. reported that Holmes threw her on the floor while she was holding the child. S.J. believed that she lost consciousness when she hit the floor. When she woke, Holmes had his foot over her face and told her that he was going to "stomp her."

**{¶ 44}** When Holmes ordered S.J. to drink his urine, S.J. said that Holmes threatened to kill her if she did not. S.J. described the cup she drank from as a glass coffee mug with "U.S. Army" on it, which was sitting on the back of the toilet.

**{¶ 45}** S.J. described for Trevino the three videos that Holmes recorded, which he made using two cellphones and a tablet. S.J. said that she felt humiliated and disgusted when Holmes recorded the videos.

**{¶ 46}** After hearing S.J.'s story, Trevino requested consent to search the home for clothing, towels, phones, tablets, and dishes. S.J. agreed and signed a "waiver of search warrant" giving police permission to conduct the search. The evidence that Trevino found at the home corroborated S.J.'s story. Trevino found the urine-soaked clothing and bathmat, "U.S. Army" coffee mug, cellphones, and tablet that S.J. described during her interview. The contents of the videos on the cellphones and tablet were also as S.J. described.

14.

{¶ 47} Trevino said that her report regarding this investigation directly quoted S.J. as saying that Holmes told her "'I want my dick sucked and it better be good[.]'" S.J. did not use the word "rape" when talking about the events. Instead, S.J. said that Holmes "made" her perform fellatio, which Trevino said is common in domestic violence situations. S.J. also never told Trevino that she wanted to perform fellatio on Holmes.

{¶ 48} Trevino agreed that S.J. told her the rape charge was inappropriate just prior to Trevino's grand jury testimony. However, according to Trevino, when Trevino told S.J. that Holmes denied raping her, S.J. said that she wanted to "go ahead with" the charges. S.J. did not claim that she had not been raped.

{¶ 49} Trevino learned near the end of November that S.J. no longer wanted to cooperate with the prosecution. Trevino was surprised because S.J. "was so hyped up and gung ho [sic] to prosecute to begin with * * *." Trevino saw the letters that S.J. sent to the court and said that S.J.'s tone changed from not wanting to prosecute the rape, to denying that it happened, to entirely recanting her story and saying that she would not testify. According to Trevino, it is common for domestic violence victims to recant the statements they initially made to police because they feel guilty, ashamed, or fearful of their attackers. But she also admitted on cross-examination that sometimes victims recant because their initial statements were not true.

{¶ 50} Regarding the interrogation videos that Holmes recorded, S.J. told Trevino that she had, in fact, been involved with the first couple of men that she named, but she

made up names of other men to "tell [Holmes] what he wanted to hear so he wouldn't hit her any more [sic]."

{¶ 51} While recording S.J. performing fellatio on him, Holmes spoke to S.J. and a man with whom S.J. had been involved. Contrary to S.J.'s testimony that Holmes said that he loved her while she was performing fellatio on him, Holmes is heard on the video making comments to the other man and telling S.J. how to perform the sex act. Trevino opined that the video showed that Holmes was angry, wanted people to know that S.J. was his property, and intended the recording as a message to the other man (to whom Holmes eventually sent the video). She did not believe that Holmes was sexually gratified by the fellatio, which told her that the act was not about sex, but was about making S.J. perform for him.

{¶ 52} Finally, Trevino said that she believed S.J. was lying when she testified at trial that she willingly performed fellatio on Holmes. Instead, Trevino found S.J.'s statements from October 29, made in the immediate aftermath of the events, more credible.

### 5. S.J.'s Explanation of Discrepancies

{¶ 53} During her testimony, S.J. explained some of the discrepancies between her testimony and the statements she purportedly made on October 29.

{¶ 54} S.J. denied sending her mother a text message on October 29 saying that she was being held against her will and had been raped, which prompted her mother to

come to the house.  Instead, she claimed that she only texted her cousin and only said that she and Holmes had fought the night before and that he had hit her.

{¶ 55} When asked why she consented to a sexual assault examination if she had not been sexually assaulted, S.J. said that she was "in a state of fog," was tired, felt "bombarded," wanted to be left alone, wanted to go home, and "did what I had to do just so that I could leave."

{¶ 56} S.J. denied telling hospital staff that Holmes forced her to fellate him, despite notes in her medical records made by a doctor, a nurse, and the SANE all indicating that Holmes "forced" or "made" S.J. perform fellatio on him.

{¶ 57} Regarding the fellatio, S.J. denied telling hospital staff or the police that Holmes threatened her by saying "'You better act like you like it and you better not bite me,'" "'I want my dick sucked and it better be good,'" or that he would mutilate her face, breasts, and genitals if she bit him.  Instead, she claimed that the only threat she reported was Holmes saying "'That's going to be you'" when they drove past a person in a wheelchair while they were running errands on October 29, but said that this statement was not related to her performing fellatio.

{¶ 58} Regarding Trevino's report that S.J. definitely wanted to pursue the rape charge, S.J. explained that she was confused when Trevino told her that Holmes denied everything.  S.J. meant that she wanted to pursue charges, just not rape charges.  Further, S.J. denied initially telling the prosecutor a version of events that was substantially similar to the versions she gave to medical providers and the police on October 29.

17.

**{¶ 59}** S.J. claimed that all of the discrepancies between her testimony and the other witnesses' testimony resulted from the others inaccurately recording or reporting what S.J. told them on October 29. She referred to the inaccuracies as a series of miscommunications or misunderstandings. She explained, "I was tired, I was drained. I didn't even want to speak to anybody. I didn't call the police. I could have. * * * I didn't even want my mom to come to the front door." She further explained that she should have expressed her opinions about the incident more forcefully at the beginning, but did not feel that she could because her friends and family were critical of her for agreeing to have sexual contact with Holmes after he beat her and wanting to have the rape charge dropped.

**{¶ 60}** S.J. said that she was not trying to protect Holmes, but she wanted "the charges to be right and fair." She said that she and Holmes discussed the case in their phone calls, but Holmes never told her to get the rape charge dropped or not come to a court date. She claimed that writing letters to the prosecutor and court was her idea (which Holmes did not object to) and that she did it so her voice would be heard because she did not feel that anyone involved with the case was listening to her.

### C. Holmes's Statements

**{¶ 61}** The state also presented testimony regarding the statements that Holmes made to the police during the investigation and the content of a phone call Holmes made to S.J. while he was in jail.

18.

### 1. Hospital Statement

{¶ 62} Officer Paul Davis of the TPD was assigned to guard Holmes while he was at the hospital following his arrest. Davis described Holmes as "cocky and cavalier" and testified that Holmes said, multiple times, that "'I am no raper [sic]. My shit is clean. How can you rape your son's mother? This is bullshit.'"

### 2. Police Interview

{¶ 63} Trevino interviewed Holmes following his arrest. She described him as "[a]ngry, upset, loud. Obviously quite agitated." He admitted during the course of the interview that he beat S.J., kicked her, and whipped her with his belt. But, Trevino said, "[h]e stated he did not rape her. He could not rape his wife. He could not rape his baby's mother." The recording of Trevino's interview with Holmes confirmed that Holmes admitted much of his conduct on October 28 and showed that his version of events largely mirrored S.J.'s trial testimony.

{¶ 64} While Holmes admitted to many of the things that he did that night, he adamantly and repeatedly denied raping S.J. According to Holmes, "I spit on her. I threw urine on her. I called her every name in the book. I slapped her, multiple times. I whipped her with my belt. [But] I didn't force her to do anything." He also denied forcing S.J. to drink his urine.

{¶ 65} According to Holmes, S.J. offered to perform fellatio on him because she wanted to "make it better." He said that he accepted her offer so that he could record the act and send the video to a man with whom S.J. had a relationship.

19.

{¶ 66} Regarding the interrogation videos, Holmes said that he recorded them with the intention of posting them online to humiliate S.J. the way she had humiliated him by posting unflattering things about him on social networking sites.

{¶ 67} Holmes also said that S.J. was free to leave at any time and that he was not holding her against her will. When S.J.'s family came to the house, she left. He would not allow her to take the child with her, however, because her behavior with other men made Holmes want to keep her away from the child.

{¶ 68} Sometime after S.J. left, Holmes received a phone call from a police negotiator. When the officer told Holmes that someone reported that he had a gun and had threatened someone with it, Holmes became "hostile" and "a little bit contentious" because he knew that the accusation was untrue. Holmes stayed in the house for a couple of hours after speaking to the negotiator, which he said was because he was "procrastinating" and trying to "mentally adjust."

### 3. Jail Phone Calls

{¶ 69} Lucas County Sheriff's Office resource officer Natalie Montecalvo, who was one of the officers responsible for the inmate phone system at the Lucas County jail, testified regarding phone calls that Holmes made to S.J. while he was in jail awaiting trial. She explained that the jail's phone system records all outgoing calls and allows officers to retrieve the recordings and run usage reports based on date, time, phone number called, and inmate phone PIN.

20.

{¶ 70} Montecalvo created a report of all phone calls made to S.J.'s phone number from November 1, 2016, to March 23, 2017. The report showed that 758 calls were made from the jail to S.J. during that time period. Of those calls, 235 actually connected. Montecalvo said that she could not tell who was trying to reach S.J. without listening to all of the recordings because several inmates' PINs (including Holmes's) were used to place calls to S.J.'s number. However, when S.J. testified, she said that all but one of the calls she received from the jail came from Holmes.

{¶ 71} The state played a recording of a call that Holmes made to S.J. on December 18, 2016, which was after S.J. told the prosecutor that she did not want to pursue the rape charge and sent her first letters asking for the rape charge to be dropped. Shortly after S.J. accepted the call, Holmes asked her if she "had any feedback," to which S.J. replied, "I told 'em what you told me to tell 'em." Holmes said that "the strategy just gonna be no face, no case." Holmes went on to say that he "don't want no plea[.] * * * I just wanna beat it outright. The only way I'm gonna be able to do that is if you never come to court against me." Even though S.J. told Holmes several times that she did not want to talk about the court case, Holmes told her that "the only thing I want is for you not to come to court. Period. At all. That's it. You gonna tell me I can count on that, then I'll continue to stay out of your way."

{¶ 72} While testifying about the phone call, Trevino said that criminal defendants use the phrase "no face, no case" to convey to a victim that the victim should not appear for court dates because, essentially, if the victim does not come to court, there is no case

for the state to prosecute. Trevino also admitted that she only listened to "one or two" of the 235 calls that Holmes made and S.J. answered and that Holmes told S.J. to appear for a court date and what to wear to court in those calls.

### D. Outcome

{¶ 73} After deliberating, the jury found Holmes guilty of all three charges. The trial court sentenced him to a mandatory 7-year prison term on the rape charge and 180 days in jail on both the domestic violence and endangering children charges. The court ordered Holmes to serve the domestic violence and endangering children sentences concurrently with the rape sentence for an aggregate term of 7 years.

{¶ 74} Holmes now appeals, raising four assignment of error:

Assignment of Error One: Hearsay statements of the victim, testified to by the SANE, were not for purposes of medical treatment and were inadmissible pursuant to Evid.R. 804(3).

Assignment of Error Two: The rape conviction is not supported by sufficient evidence.

Assignment of Error Three: The rape conviction is against the manifest weight of the evidence.

Assignment of Error Four: Appellant was deprived of his Sixth Amendment right to counsel as trial counsel rendered ineffective assistance.

22.

## II. Law and Analysis

### A. The Trial Court Properly Admitted Testimony About S.J.'s Hearsay Statements

{¶ 75} In his first assignment of error, Holmes contends that the SANE was improperly allowed to testify to S.J.'s out-of-court statements because they were hearsay and did not fall within the exception in Evid.R. 803(4) for statements related to medical diagnosis and treatment. Specifically, Holmes objects to the admission of S.J.'s statements that Holmes told her not to bite him while fellating him, that he would mutilate her if she did, and that he "made" her fellate him. The state counters that the trial court properly admitted the statements because they were pertinent to Jimenez diagnosing and treating S.J.'s physical and emotional trauma, they were otherwise admissible as excited utterances, and they were cumulative to the other testimony.

{¶ 76} "On appeal, challenged hearsay is subject to de novo review under the applicable hearsay rule, rather than the more deferential review employed for discretionary rulings" because "[w]hile there is discretion to admit or exclude relevant evidence, there is no 'discretion' to admit hearsay." *State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442, ¶ 29, 32 (6th Dist.), citing *State v. Sutorius*, 122 Ohio App.3d 1, 7, 701 N.E.2d 1 (1st Dist.1997), and *State v. Sorrels*, 71 Ohio App.3d 162, 165, 593 N.E.2d 313 (1st Dist.1991).

{¶ 77} Under Evid.R. 803(4), statements are not hearsay when they are "made for purposes of medical diagnosis or treatment and describ[e] medical history, or past or

23.

present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." For statements to be admissible under this exception, the declarant's motive must be consistent with that of a patient seeking treatment and it must be reasonable for the medical provider to rely on the information in diagnosing and treating the declarant. *State v. Ridley*, 6th Dist. Lucas No. L-10-1314, 2013-Ohio-1268, ¶ 49, citing *State v. Clary*, 73 Ohio App.3d 42, 52, 596 N.E.2d 554 (10th Dist.1991). We have previously found that a description of the injuring event and identification of the perpetrator fall within the medical diagnosis or treatment hearsay exception. *Id.* at ¶ 52, citing *State v. Stahl*, 9th Dist. Summit No. 22261, 2005-Ohio-1137, ¶ 15.

{¶ 78} First, we note that Jimenez did not testify to S.J.'s alleged statement that Holmes would mutilate her face, breasts, and genitals if she bit him; Fischer did. And although nothing indicates that this statement was related to S.J.'s medical treatment, "[t]estimony about threats is not hearsay." *State v. Jalowiec*, 91 Ohio St.3d 220, 227, 744 N.E.2d 163 (2001); *State v. Skipper*, 2d Dist. Montgomery No. 25404, 2013-Ohio-4508, ¶ 14 ("threats are 'verbal acts' which are not hearsay. Threats are offered to prove the words were spoken rather than to prove the truth of the statement."). Thus, we find that the trial court properly allowed the statement.

{¶ 79} We also find that Jimenez was properly allowed to testify to S.J.'s other statements because they constituted a description of the injuring event made in the course of S.J. seeking medical treatment. That is, S.J.'s statements that Holmes "made" her

24.

fellate him, told her it had "better be good," and warned her not to bite him all described how the injuring event (i.e., the oral rape) occurred. And S.J. made the statements to a nurse who was in the process of conducting an examination, one of the purposes of which was ensuring that S.J. was physically and mentally cared for following a sexual assault. Because S.J.'s statements fell within the exception in Evid.R. 803(4), we find that the trial court properly allowed Jimenez to testify to these statements. Accordingly, we find that Holmes's first assignment of error is not well-taken.

### B. Holmes's Conviction is Supported by Sufficient Evidence

{¶ 80} In his second assignment of error, Holmes argues that his rape conviction is not supported by sufficient evidence because the state failed to prove the element of force. The state responds that the testimony of its witnesses, if believed, supports a finding that Holmes forced S.J. to fellate him.

{¶ 81} In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, we will not weigh the evidence or assess the credibility of the witnesses. *State v. Were,* 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 132. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

25.

{¶ 82} Holmes was convicted of rape under R.C. 2907.02(A)(2), which requires the state to prove that the defendant engaged in sexual conduct with another by compelling the other person to submit by force or threat of force. "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). "A defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit." *State v. Schaim*, 65 Ohio St.3d 51, 55, 600 N.E.2d 661 (1992), paragraph one of the syllabus. The victim need not physically resist the offender or vocalize her fear or duress for the state to prove that the defendant used or threatened force. *State v. Heiney*, 6th Dist. Lucas No. L-16-1042, 2018-Ohio-3408, ¶ 121, citing R.C. 2907.05(D) and *State v. Stevens*, 2016-Ohio-446, 58 N.E.3d 584, ¶ 25 (3d Dist.).

{¶ 83} Proving a threat of force requires a showing that "the rape victim's will was overcome by fear or duress * * *." *State v. Eskridge*, 38 Ohio St.3d 56, 59, 526 N.E.2d 304 (1988). The threat does not need to be overt or direct. *State v. Rupp*, 7th Dist. Mahoning No. 05 MA 166, 2007-Ohio-1561, ¶ 33. In fact, "[a] threat of force can be inferred from the circumstances surrounding sexual conduct * * *." *Schaim* at paragraph one of the syllabus. Moreover, "[t]he law is clear: *any* amount of physical force or threat of physical force, however slight, is sufficient to support * * *" a rape conviction under R.C. 2907.02(A)(2). (Emphasis sic.) *Heiney* at ¶ 122.

26.

{¶ 84} Whether the state proved that Holmes used or threatened forced to compel S.J. to perform fellatio on him comes down to credibility. The jury had to determine which version of S.J.'s story (i.e., the one she told the day after the rape or the one she testified to at trial) was more credible. The jury chose to believe the version that S.J. told medical providers and police officers in the hours after the rape rather than the version she provided at trial, which we must honor. On that basis, we find that the testimony that Holmes "made" S.J. fellate him—an act that happened following a three-hour period during which Holmes rubbed vomit in S.J.'s face, urinated on her, made her drink urine, beat her with his hands and a belt, made her clean the house wearing nothing but her underwear, and recorded multiple videos of him interrogating her about her other relationships while she knelt on the floor wearing only her underwear—is sufficient evidence that Holmes created the belief that he would use physical force if S.J. did not submit to his request for fellatio and that S.J.'s "will was overcome by fear or duress." *Eskridge* at 59; *Schaim* at paragraph one of the syllabus.

{¶ 85} Because the state presented sufficient evidence to show that Holmes compelled S.J. to submit by threat of force, we find that Holmes's second assignment of error is not well-taken.

## C. Holmes's Conviction is not Against the Manifest Weight of the Evidence

{¶ 86} In his third assignment of error, Holmes argues that his conviction is against the weight of the evidence because the jury apparently found only certain parts of S.J.'s testimony credible. The state argues that Holmes's conviction should stand

27.

because the jury was free to believe the other witnesses who contradicted S.J.'s trial testimony.

{¶ 87} When we review a claim that a verdict is against the manifest weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier-of-fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541. We do not view the evidence in a light most favorable to the prosecution. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 387. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172*, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 88} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the jury's credibility determinations, given that it is the jury that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. The jury, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or

28.

disbelieve all, part, or none of a witness's testimony. *State v. Caudill*, 6th Dist. Wood No. WD-07-009, 2008-Ohio-1557, ¶ 62, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶ 89} After reviewing the evidence and the credibility of the witnesses and weighing the conflicting testimony, we are not convinced that the evidence weighs heavily against a conviction. We cannot say that the jury lost its way or created a manifest miscarriage of justice by believing the witnesses who testified to S.J.'s initial version of events rather than believing the version of events that S.J. testified to at trial. The fact that the jury believed some parts of S.J.'s story (i.e., that Holmes committed domestic violence by beating her with his hands and a belt and committed endangering children by hitting S.J. while she was holding their son) and disbelieved other parts (i.e., that the fellatio was consensual) does not lead to the conclusion that the jury lost its way. We find, therefore, that Holmes's conviction is not against the manifest weight of the evidence. Thus, his third assignment of error is not well-taken.

### D. Holmes Received Effective Assistance of Counsel

{¶ 90} In his final assignment of error, Holmes complains that his trial counsel was ineffective because she failed to object to certain testimony, did not request jury instructions on lesser-included offenses, and failed to obtain "exculpatory evidence" in the form of recorded jail phone conversations between him and S.J. The state responds that trial counsel effectively represented Holmes because all of the claimed deficiencies constituted trial strategy. We agree with the state.

29.

{¶ 91} To prevail on a claim of ineffective assistance of counsel, the appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Properly licensed Ohio lawyers are presumed to be competent, *State v. Gondor,* 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 62, and there are "countless" ways for an attorney to provide effective assistance in a case, so "'[j]udicial scrutiny of counsel's performance must be highly deferential.'" *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 689.

{¶ 92} To establish ineffective assistance of counsel, the appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002), quoting *Strickland* at 694.

{¶ 93} Counsel is "strongly presumed" to have rendered adequate assistance and "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985), quoting *Strickland* at 694-695. Generally, trial strategy and tactical decisions—even debatable ones—cannot form the basis of a claim of

30.

ineffective assistance of counsel. *State v. Grissom*, 6th Dist. Erie No. E-08-008, 2009-Ohio-2603, ¶ 22.

{¶ 94} Holmes first contends that his trial counsel was ineffective because she did not object to statements by various witnesses that Holmes "made" or "forced" S.J. to perform fellatio or Lenhardt's testimony that Holmes "repeatedly" raped S.J. The record reveals that counsel did, in fact, object to witnesses testifying to S.J.'s out-of-court statements and that the trial court overruled the objections. Holmes's argument to the contrary lacks merit.

{¶ 95} As to Lenhardt's testimony, Holmes correctly notes that counsel did not object to Lenhardt's statement that a woman had been "raped repeatedly." Lenhardt made this statement in the context of explaining the call she responded to on October 29. That is, she was relating to the jury what she had learned about the situation from dispatch and other officers on the scene—not claiming that Holmes had committed multiple acts of rape against S.J.—which counsel clarified in her cross-examination of Lenhardt. "Not objecting to testimony is a reasonable trial strategy that counsel may use to avoid attracting a jury's attention to a matter." *State v. Stoermer*, 2d Dist. Clark No. 2017-CA-93, 2018-Ohio-4522, ¶ 37; *State v. Braswell*, 6th Dist. Lucas No. L-16-1197, 2108-Ohio-3208, ¶ 27, citing *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 90. And trial strategy cannot form the basis of an ineffective-assistance claim. *Grissom* at ¶ 22.

31.

{¶ 96} Furthermore, "[t]he failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel." *State v. Holloway*, 38 Ohio St.3d 239, 244, 527 N.E.2d 831 (1988). Rather, the appellant must first show that there was a substantial violation of defense counsel's essential duties to her client and, second, that he was materially prejudiced by counsel's ineffectiveness. *State v. Shaw*, 6th Dist. Lucas No. L-15-1165, 2016-Ohio-7699, ¶ 19, citing *Holloway* at 244. This can be done by showing that a single failure to object resulted in the admission of evidence so prejudicial that it essentially defaulted the case to the state or by counsel "'so consistently fail[ing] to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice.'" *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 140, quoting *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir.2006). Holmes does not point to anything in the record showing that this unchallenged testimony was so prejudicial that its admission essentially forfeited the case. Nor does he show that counsel consistently failed to object to clearly objectionable testimony. Thus, Holmes cannot show that counsel's failure to object to Lenhardt's testimony constituted ineffective assistance.

{¶ 97} Next, Holmes argues that counsel should have requested jury instructions on the lesser-included offenses of attempted rape, gross sexual imposition, or both. Like failure to object, "failure to request an instruction for lesser included offenses without more does not establish ineffective assistance of counsel." *State v. White*, 6th Dist. Lucas No. L-06-1363, 2008-Ohio-2990, ¶ 62, citing *State v. Griffie*, 74 Ohio St.3d 332, 333,

32.

658 N.E.2d 764 (1996). Something "more" could include, for example, "evidence that the failure to make the request was a reason other than trial strategy." *Id.* In this case, Holmes again fails to point to anything in the record showing that counsel's failure to request jury instructions on lesser-included offenses was anything other than trial strategy. So Holmes cannot show that counsel's failure to ask for jury instructions on lesser-included offenses constituted ineffective assistance.

{¶ 98} Finally, Holmes contends that trial counsel was ineffective because she did not obtain "exculpatory evidence" from the Lucas County jail phone records, which, he claims, would have shown that S.J. changed her story about the rape before she began speaking to him while he was in jail. However, "[d]iscovery decisions are presumed to be trial strategies which do not constitute ineffective assistance of counsel." *State v. Bennett*, 6th Dist. Wood No. WD-08-005, 2008-Ohio-5812, ¶ 11. Once again, Holmes has not pointed to anything in the record to overcome this presumption. And, again, counsel's strategic decisions do not constitute ineffective assistance.

{¶ 99} Because we find that all of trial counsel's actions that Holmes takes issue with constituted trial strategy (not ineffective assistance of counsel), we further find that Holmes's fourth assignment of error is not well-taken.

33.

### III.  Conclusion

{¶ 100} For the foregoing reasons, the April 24, 2017 judgment of the Lucas County Court of Common Pleas is affirmed.  Holmes is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.       _____
JUDGE

Arlene Singer, J.      

_____

Christine E. Mayle, P.J.       JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.